**MOUNTAIN SIDE MOBILE ESTATES PARTNERSHIP, Robert Dalke, Marilyn Dalke, Petitioners,**

v.

**SECRETARY OF HOUSING AND URBAN DEVELOPMENT, on behalf of Jacqueline, Jaime, Michael and Shena VanLoozenoord, and on behalf of Michael Brace, Respondents,**

**Jacqueline VanLoozenoord; James VanLoozenoord; Michael VanLoozenoord; Shena VanLoozenoord; Michael Brace, Intervenors.**

No. 94–9509.

United States Court of Appeals, Tenth Circuit.

May 30, 1995.

Stephen E. Kapnik (Don D. Johnson with him, on the brief) of Lohf, Shaiman & Jacobs, P.C., Denver, CO, for petitioners.

Gregory B. Friel (Deval L. Patrick, Asst. Atty. Gen., Jessica Dunsay Silver, with him,

on the brief), Dept. of Justice, Washington, DC, for respondents.

Penda D. Hair (Elaine R. Jones, Director–Counsel and Theodore M. Shaw, NAACP Legal Defense and Educational Fund, Inc., New York City, with her, on the brief), NAACP Legal Defense and Educational Fund, Inc., Washington, DC, for intervenors.

Joseph L. Coppola of Rice, Coppola & Hamrick, P.C., Englewood, CO, and Christopher B. Hanback of Jackson & Campbell, P.C. Washington, DC, for Amici Curiae.

Before KELLY, BARRETT, and HENRY, Circuit Judges.

BARRETT, Senior Circuit Judge.

Mountain Side Mobile Estates Partnership, Robert Dalke, and Marilyn Dalke (collectively referred to as Mountain Side) appeal from the Third Initial Decision on Remand and Order of the Department of Housing and Urban Development (HUD) entered after hearings before an administrative law judge. The Order awarded damages to intervenors in total amount of $9,178.50 and injunctive relief based on the Secretary of Housing and Urban Development's third remand finding of discrimination in violation of the Fair Housing Act (FHA), 42 U.S.C. §§ 3601, et seq.

### Facts

Mountain Side owns a mobile home park in Jefferson County, Colorado, which was built in the 1960's. Robert and Marilyn Dalke have been the park's resident managers since December, 1989. The park consists of 229 mobile home lots each of which is available to be leased as real property for placement of one mobile home. The park provides utilities, including water, power, telephone, and sewer hookups, to each lot. The park was built to accommodate "older" single-wide mobile homes of 8 to 10 feet wide and 30 to 55 feet long. The park cannot accommodate the modern single-wide or double-wide mobile homes, which are much wider and longer.

The density in the park is almost 10 mobile homes per acre, whereas modern parks average 5 to 6 mobile homes per acre.

Prior to March, 1989, the park was an adults-only park; Mountain Side prohibited any person under 21 years of age from living in the park. After the 1988 amendments to the FHA, effective March 12, 1989, Mountain Side instituted a new occupancy policy of no more than three persons per mobile home. The FHA amendments prohibit discrimination on the basis of familial status unless a housing provider can meet a narrow exemption for "housing for older persons." Mountain Side determined that it could not meet the exception. Since March, 1989, it has accepted all residents, including families with minor children, subject to its occupancy policy.

In September, 1991, Jacqueline VanLoozenoord (VanLoozenoord), her three minor children, and her "roommate and companion," Michael Brace (Brace), moved into a mobile home in the park.[1] Neither VanLoozenoord nor Brace contacted the park management or submitted an application for tenancy prior to their occupancy. They purchased the mobile home in place. The sellers did not advise them that the park had a three person occupancy limit.

Shortly after they moved in, Robert Dalke inquired of Brace as to the number of residents in the mobile home. When Brace informed him that five people were living there[2], Dalke informed him of the park's three person per lot occupancy limit and told him they would have to move. Subsequently, Mountain Side served VanLoozenoord and Brace with a notice, dated October 14, 1991, demanding that they vacate the park by November 14, 1991.

A summons, dated November 8, 1991, was posted on the door of VanLoozenoord's and Brace's mobile home ordering them to appear in Jefferson County District Court to answer an eviction complaint filed by Mountain Side. The eviction hearing was held on

---

1. Brace testified that he and VanLoozenoord were not legally married but that he considered her his wife for "all intents and purposes." (Tr. I at 66, 122–124).

2. Brace's son Myron subsequently moved into the mobile home in the summer of 1992 but was not living there when this dispute arose.

January 16, 1992, and the court ruled in favor of Mountain Side solely on the ground that VanLoozenoord and Brace had failed to apply for residency in the park. On February 3, 1992, VanLoozenoord and Brace were ordered to remove their mobile home from the park within 48 hours. VanLoozenoord filed a written complaint with the Denver office of HUD asserting that Mountain Side had violated the familial status provision of the 1989 amendments to the FHA. Brace filed a similar companion complaint.

On July 24, 1992, HUD caused two separate charges of discrimination to be issued, one on behalf of VanLoozenoord and her three children and one on behalf of Brace (collectively referred to as Complainants). After charges were filed, HUD began the conciliation process required by the FHA. Mountain Side agreed to conciliate, hired counsel to attend and assist them, and attended the conciliation meeting arranged by HUD. However, Complainants refused to attend or participate in any conciliation or otherwise discuss settlement.

Mountain Side elected to have a judicial hearing of the charges before an independent United States Administrative Law Judge (ALJ). The ALJ held a full evidentiary hearing on October 29 and 30, 1992, and issued his Initial Decision and Order on March 22, 1993, dismissing the charges of discrimination. In that order, the ALJ set forth in detail 47 findings of fact which will be reviewed *infra*. On April 26, 1993, the Secretary of HUD remanded the case for reconsideration. The ALJ issued an Initial Decision on Remand and Order again rejecting HUD's claims on June 18, 1993. The Secretary again remanded the case to the ALJ who issued his Second Initial Decision on Remand and Order on September 20, 1993, again dismissing the charges. On October 20, 1993, the Secretary overturned the ALJ's decision, entered judgment for HUD, and remanded the case for further proceedings consistent therewith. On December 17, 1993, the ALJ issued his Third Decision on Remand and Order, granting injunctive relief

and awarding damages to Complainants. The decision became final on January 18, 1994, after the expiration of the Secretary's 30–day review period.

### *Issues*

On appeal, Mountain Side contends that: (1) the ALJ's Initial Decision and Order became final upon the failure of the Secretary to complete a review within 30 days; (2) the Complainants lack standing to bring the charges under the FHA; (3) due to Complainants' refusal to participate in conciliation required by the FHA, the charges should be dismissed or at least no damages awarded; (4) discrimination in violation of the FHA familial status amendments by a private housing provider is not proven by disparate impact alone; (5) the Secretary's three remands were arbitrary and capricious and violated Mountain Side's right to due process; (6) the charges are barred by res judicata; and (7) there is no basis in the record for the award of injunctive relief.[3]

### I.

■ Mountain Side contends that the ALJ's Initial Decision and Order of March 22, 1993, became final upon the failure of the Secretary to complete a review within 30 days, because the regulations describing the Secretary's review power exceed the authority granted by the FHA. The Secretary remanded to the ALJ within the 30–day period with directions to consider HUD's motion for reconsideration.

Mountain Side argues that the intent of the FHA is that "a final order will exist on the 31st day following the issuance of the ALJ's order determining the case on the merits." (Petitioner's Opening Brief at 35). They assert that the "final order may take one of two forms: it may be the ALJ's order, unaltered by the Secretary's review, or it may be the ALJ's order as modified by the Secretary's timely review." *Id.*

In addition, Mountain Side claims that the Secretary's order of April 21, 1993, while

---

**3.** Because of the dispositive nature of issues (1) through (4), we do not address issues (5), (6), & (7).

nominally referred to as a remand, was in actuality merely an unauthorized extension of time for review. Mountain Side asserts that "review" requires direction to the ALJ to take new evidence or consider new issues not originally before the ALJ and that the Secretary's April 21, 1993, order did neither. Therefore, according to Mountain Side, all subsequent orders entered by the Secretary were beyond HUD's jurisdiction and are void.

HUD asserts that Congress has expressly delegated to the Secretary the power to promulgate regulations implementing the FHA, 42 U.S.C. § 3614a, and that any regulation interpreting the Secretary's power of review must be upheld if it is reasonable and not in conflict with the plain language of the statute.

The FHA provides:

(h) **Review by Secretary; service of final order**

(1) The Secretary may review any finding, conclusion or order issued under subsection (g). Such review shall be completed not later than 30 days after the finding, conclusion, or order is so issued; otherwise the finding, conclusion or order becomes final.

42 U.S.C. § 3612(h)(1).

HUD regulations interpret this provision to permit the Secretary to "affirm, modify or set aside, in whole or in part, the initial decision or remand the initial decision for further proceedings." 24 C.F.R. § 104.930(a).

■■■ When, as in the FHA § 3614a,[4] "Congress explicitly delegates to an agency the authority to elucidate a specific statutory provision, the agency's interpretation is given controlling weight unless arbitrary, capricious, or manifestly contrary to the statute. Absent such an explicit delegation, the agency's interpretation generally controls if it is reasonable and consistently applied, though no deference is warranted if the interpretation is inconsistent with the legislative intent reflected in the language and structure of the

statute or if there are other compelling indications that it is wrong." *New Mexico Dep't of Human Servs. v. Department of Health & Human Servs. Health Care Fin. Admin.,* 4 F.3d 882, 884–85 (10th Cir.1993) (citations omitted). The standard is the same whether the agency interpretation is performed through rulemaking or informal adjudication. *Arco Oil & Gas Co. v. EPA,* 14 F.3d 1431, 1433 (10th Cir.1993).

Applying this standard, we hold that the agency's interpretation of its review power under § 3612(h)(1) in 24 C.F.R. § 104.930(a) is reasonable, not "arbitrary, capricious," nor "manifestly contrary to the statute." In addition, there is no indication that the Secretary's interpretation of his review powers is inconsistent with the legislative intent nor are there any other compelling indications that it is wrong.

Therefore, we conclude that the Secretary acted within his powers when, in accordance with his regulations, he remanded in whole the ALJ's Initial Decision and Order within 30 days "so that the Administrative Law Judge may consider fully and fairly" HUD's April 13, 1993, Motion for Remand of the Administrative Law Judge's Initial Decision and any opposition thereto. (Secretary's First Remand at 2).

## II.

■■■ Mountain Side contends that based on the definition of familial status the Complainants lack standing to bring these charges since the group which moved into and lived in the park is not a "family" entitled to the protections of the FHA. Mountain Side argues that even if part of the group would be entitled to protection if it were a separate unit, the presence of unrelated persons cannot entitle the group as a whole to familial status. Therefore, since the only group which ever sought housing consisted of a parent, her three children, and another unrelated adult, the group is not entitled to protection under the FHA.

---

**4.** 42 U.S.C. § 3614a provides: "The Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this subchapter [FHA § 3604 et seq.]."

HUD asserts that the VanLoozenoord–Brace household fell within the definition of a "family" because the household contained minor children living with their mother and that the presence of unrelated persons does not destroy their familial status. In addition, HUD contends that Brace has standing under the FHA even if he is not the father or legal custodian of VanLoozenoord's minor children since he is an "aggrieved person."

■ Standing is a question of law subject to *de novo* review. *Hackford v. Babbitt,* 14 F.3d 1457, 1465 (10th Cir.1994).

The FHA defines familial status as:

(k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) a parent or another person having legal custody of such individual or individuals; or

(2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

42 U.S.C. § 3602(k).

The FHA also allows an "aggrieved person" to file a complaint based on alleged discriminatory housing practices within one year of the alleged discrimination. 42 U.S.C. § 3610(a). The FHA defines an "aggrieved person" as:

(i) "Aggrieved person" includes any person who—

(1) claims to have been injured by a discriminatory housing practice; or

(2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

42 U.S.C. § 3602(i).

This definition has been applied to individuals who have not themselves been members of one of the classes protected by the FHA. *See e.g., HUD v. Blackwell,* 908 F.2d 864 (11th Cir.1990) (upholding intervention of white lessors of house that was under contract to black family against whom respondent discriminated); *Secretary v. Jerrard,* Fair Housing–Fair Lending (P–H) ¶ 25,005 (September 28, 1990) (white tenant evicted

because of black visitors). Therefore, whether Brace was a member of VanLoozenoord's "family" for the purposes of familial status is irrelevant. Brace, claiming injury by a discriminatory housing practice, comes within the definition of an "aggrieved person" and has standing under the FHA.

Since HUD filed separate charges of discrimination on behalf of Brace and VanLoozenoord, each has standing separate and apart from the other.[5] Therefore, the ALJ's jurisdiction over both sets of charges was proper.

### III.

■ Mountain Side argues that Complainants' participation in the mandatory conciliation process is "a condition precedent and is jurisdictional." Whether failure to attend a conciliation meeting is a jurisdictional defect requiring dismissal of the complaints is a legal question subject to *de novo* review. *FDIC v. Hulsey,* 22 F.3d 1472, 1479 (10th Cir.1994).

■ The FHA requires that "the Secretary shall, to the extent feasible, engage in conciliation ..." 42 U.S.C. § 3610(b)(1). This has been interpreted to require that the Secretary undertake conciliation in "good faith." *See Morgan v. Secretary of Housing and Urban Dev.,* 985 F.2d 1451, 1456 (10th Cir.1993). However, "[w]hether the Secretary conducted conciliation in good faith is not jurisdictional; rather it goes to whether a court should stay proceedings pending further conciliation efforts or entertain the matter immediately." *Id.* (citations omitted). In determining whether the Secretary has conducted conciliation in good faith, we do not become embroiled in the details of the offers and counteroffers, but determine whether the agency provided a "fair opportunity" for settlement. *Id.*

The record demonstrates that HUD met its obligations under the FHA. HUD arranged a conciliation meeting between the parties and was prepared to conciliate if Complainants had attended. The fact that Complainants refused to attend the meeting or engage in any other form of settlement

---

**5.** We specifically decline to decide if the group "as a whole" would have standing.

negotiations cannot be attributed to HUD absent extreme circumstances not found in this case.

■ Mountain Side urges that, at a minimum, damages should not be allowed where there was a total failure to conciliate. We believe that the Secretary's efforts and the efforts, or lack thereof, of both parties to undertake conciliation, together with all the circumstances, are considerations in determining the penalty imposed. *Id.* at 1457. The Secretary found that although the Complainants had suffered injury, they "were, in part, responsible for their own emotional distress by failing to conciliate with [Mountain Side]." (Third Initial Decision on Remand and Order at 8). In taking these factors into consideration in making his award of damages, the Secretary fulfilled his obligations under the FHA.

### IV.

Mountain Side contends that the Secretary erred, as a matter of law, in concluding that disparate impact on families by a facially neutral policy of a private housing provider alone suffices to prove unlawful discrimination under the FHA.

■ Under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, any person adversely affected by an agency adjudication is entitled to judicial review thereof, and the reviewing court may set aside the agency's determination pursuant to § 706(2) only if it is found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (E) unsupported by substantial evidence ...; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2).

■ When we review an agency's decision under the arbitrary, capricious or abuse of discretion standard, "[o]ur review is narrow and deferential; we must uphold the agency's action if it has articulated a rational basis for the decision and has considered

relevant factors." *Colorado Dep't of Social Servs. v. United States Dep't of Health & Human Serv.,* 29 F.3d 519, 522 (10th Cir. 1994). However, these limitations do not apply to questions of law. "The '[f]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.'" *Nielson v. Sullivan,* 992 F.2d 1118, 1119–20 (10th Cir.1993) (quoting *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir.1984) (citations omitted)).

Mountain Side contends that discrimination in violation of the FHA familial status amendments by a private housing provider is not proven by disparate impact alone. In the alternative, Mountain Side asserts that "even assuming that the disparate impact of a neutral policy can prove unlawful discrimination under Title VIII, no disparate impact was proven" because there was no evidence of the local population statistics nor any evidence regarding the qualified population. (Petitioner's Opening Brief at 17–26).

HUD argues that the disparate impact theory applies to FHA claims against private housing providers. HUD claims that a prima facie case of disparate impact is shown when a facially neutral rule disproportionately excludes a member of a protected group. HUD claims that it met this burden by showing that Mountain Side's three-person rule disproportionately excludes families with three children.

■ The FHA prohibits discrimination in housing on the basis of familial status. 42 U.S.C. § 3604. Discrimination may occur either by disparate treatment or disparate impact. *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1501 (10th Cir.1995). A claim of disparate impact, unlike a claim of disparate treatment,[6] does not require a finding of intentional discrimination. Indeed, "the necessary premise of the disparate impact approach is that some [housing] practices, adopted without a deliberately discriminatory

---

**6.** The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against the plaintiff. *Honce v. Vigil,* 1 F.3d 1085, 1088 (10th Cir.1993) (citations omit-

ted). Disparate treatment analysis involves differential treatment of similarly situated persons or groups. *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1501 (10th Cir.1995) (citations omitted).

motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988) (Title VII employment discrimination); *Drake v. City of Fort Collins,* 927 F.2d 1156, 1161 (10th Cir.1991) (Title VII).[7]

To establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific policy caused a significant disparate effect on a protected group. *Ortega v. Safeway Stores, Inc.,* 943 F.2d 1230, 1242 (10th Cir.1991). In Title VII employment discrimination cases, plaintiffs may rely solely on a statistical showing of disparate effect to establish a prima facie case of disparate impact. However, this circuit has not decided whether discriminatory effect alone is sufficient to establish a prima facie case of disparate impact in Title VIII housing discrimination cases.

Here, the Secretary relied on national statistics to establish a case of disparate effect. The Secretary presented national statistics showing that "at least 71.2% of all U.S. households with four or more persons contain one or more children under the age of 18 years; that at least 50.5% of U.S. families with minor children have four or more individuals; and that at most 11.7% of households without minor children have four or more persons" to determine that the plaintiffs had proven discriminatory effect. (Secretary's Second Remand at 7).

In his Initial Decision and Order, the ALJ found that there " ... is no evidence that statistics which establish the percentage of families with minor children nationwide are the same in Jefferson County or even the Denver metropolitan area. Mr. Coil attempted to address this deficiency by pointing out that the percentage of households with four or more individuals that are families in Jefferson County (for which statistics are available) is almost identical to the nationwide percentage ... I am unwilling to speculate that the same correlation exists as to the percentage of households with minor children. Accordingly, the Charging Party has failed to establish a prima facie case of disparate impact." (Initial Decision and Order, p. 25). Even so, the ALJ reasoned that "Even if these statistics established a prima case, Respondents have produced evidence of a business justification for the occupancy limitation." *Id.* at 26.

Upon review, the Secretary relied exclusively on *Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), where the Supreme Court held that, in a Title VII case, nationwide statistics regarding physical height and weight characteristics could be relied upon because there was "no reason to suppose" that the data for the Alabama population would differ markedly. The Secretary placed the burden on Respondents to adduce countervailing evidence, and lacking such the Secretary concluded that the Charging Party had established a prima facie case of disparate impact. (Secretary's Initial Decision and Order, pp. 8–9).

All of the Title VIII cases we have reviewed contain recitals to the effect that the discriminatory impact (effect) was based on statistical evidence regarding the narrowly defined area in question. *See Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 929 (2d Cir.), *aff'd.,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam) (court focused on statistics for the Town of Huntington and housing projects in existence in that town); *Arthur v. City of Toledo,* 782 F.2d 565, 576 (6th Cir.1986) (relied on census data for low-income households in Toledo eligible for the proposed program on the waiting list); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1060–65 (4th Cir. 1982) (discussing racial distribution of Clarkton proper and Bladen County); *Halet v. Wend Inv. Co.,* 672 F.2d 1305 (9th Cir.1982) (in challenge to adults-only rental policy of apartments in Los Angeles, court focused on percentage of Blacks, Hispanics, Whites, and female-head-of-the-households with children in Los Angeles); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 149 (3rd Cir.1977), *cert.*

---

7. We look to Title VII employment discrimination cases for guidance with regard to Title VIII housing discrimination claims. *Honce v. Vigil,* 1 F.3d 1085, 1088 (10th Cir.1993) (citations omitted).

*denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978) (court focused on racial discrimination in Philadelphia and in the PHA system).

■■■ In the Title VII context, we have held that a defendant's justification for the challenged action should not be considered in assessing the establishment of a prima facie case. *See Kenworthy v. Conoco, Inc.,* 979 F.2d 1462 (10th Cir.1992); *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1119–21 (10th Cir.1991). For purposes of this opinion, we shall assume, just as the ALJ did, that a Title VIII plaintiff may establish a prima facie case of discriminatory impact by proof of national statistics relative to U.S. households as presented here. Thus, a Title VIII prima facie case, once established, as here, could alone suffice to prove a Title VIII violation unless the defendants justify the discriminatory effect which has resulted from their challenged actions. *Rizzo,* 564 F.2d at 146 (unrebutted proof of discriminatory effect alone may justify a federal equitable response).

## V.

### The Merits

The record reveals that Mountain Side presented evidence relative to legitimate, non-pretextual reasons for its occupancy limitations: (1) sewer systems limitations, and (2) concern over the quality of park life.

In *Metropolitan Housing Development Corp. v. Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied.* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), the court set forth four critical factors to be evaluated in determining under what circumstances conduct which produces discriminatory impact but which was taken without discriminatory intent is violative of § 3604(a):

(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standards of *Washington v. Davis;*[8] (3) what is the defendant's interest in taking

the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of a [protected class] or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Id.* (footnote added).

The Fourth Circuit adopted the Seventh Circuit's analysis in *Smith v. Town of Clarkton, N.C.,* 682 F.2d 1055, 1065 (4th Cir.1982). In *City of Toledo, Ohio,* 782 F.2d at 575, the court adopted three of the four factors enunciated by the Seventh Circuit. The court declined to adopt the second factor relating to evidence of discriminatory intent inasmuch as the Seventh Circuit recognized that it was the least important factor. *Id.*

We adopt the Sixth Circuit's analysis of disparate impact. We also decline to adopt the second factor of discriminatory intent from the Seventh Circuit's analysis. Discriminatory intent is the basis of a disparate treatment claim. However, disparate impact claims are premised on policies or practices which are adopted without a discriminatory motive but which are functionally equivalent to intentional discrimination. *See Watson,* 487 U.S. at 987, 108 S.Ct. at 2785.

■■■ The three factors we will consider in determining whether a plaintiff's prima facie case of disparate impact makes out a violation of Title VIII are: (1) the strength of the plaintiff's showing of discriminatory effect; (2) the defendant's interest in taking the action complained of; and (3) whether the plaintiff seeks to compel the defendant affirmatively to provide housing for members of a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. In applying these factors, we are mindful of the Seventh Circuit admonition that "we must decide close cases in favor of integrated housing." *Arlington Heights II,* 558 F.2d at 1294 ("close" case although only two of four factors present).

---

**8.** In *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976), the Court concluded that discriminatory intent is a prerequisite to establishing a violation of the Equal Protection Clause.

### 1. Strength of Plaintiff's Showing of Discriminatory Effect

The Secretary relied on national statistics that "at least 71.2% of all U.S. households with four or more persons contain one or more children under the age of 18 years; that at least 50.5% of U.S. families with minor children have four or more individuals; and that at most 11.7% of households without minor children have four or more persons" to determine that the plaintiffs had proven discriminatory effect. (Secretary's Second Remand at 7). Although discriminatory effect is generally shown by statistical evidence, any statistical analysis must involve the appropriate comparables. *See Wards Cove Packing Co., Inc., v. Atonio,* 490 U.S. 642, 650–51, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989) (Title VII); *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977) ("a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teachers population in the relevant labor market"). In some cases national statistics may be the appropriate comparable population. *See Dothard v. Rawlinson,* 433 U.S. at 330, 97 S.Ct. at 2727 (1977) (district court did not err in using national height and weight statistics to find discriminatory effect on women "where there is no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those of the national population"). However, those cases are the rare exception and this case is not such an exception.

In this case, the appropriate comparables must focus on the local housing market and local family statistics. The farther removed from local statistics the plaintiffs venture, the weaker their evidence becomes. There is no dispute about the veracity of the Secretary's findings of discriminatory effect on the national level. However, this national level discriminatory effect, although substantially supported by the record, is so far removed from the local arena that it is of little weight in our analysis.

### 2. Interest of Defendant in Taking the Action Complained Of

The second factor which we consider is the interest of the defendant in taking the action which produces the discriminatory effect. The *Arlington Heights II* court recognized that "[i]f the defendant is a private individual or a group of private individuals seeking to protect private rights, the courts cannot be overly solicitous when the effect is to perpetuate segregated housing." 558 F.2d at 1293. On the other hand, when a defendant can present valid non-pretextual reasons for the challenged practices, the courts should not be overzealous to find discrimination.

Mountain Side presented two legitimate, non-pretextual reasons for its occupancy limit: (1) sewer systems limitations, and (2) concern over the quality of park life. These overcame plaintiffs' prima facie case, as more fully hereafter discussed.

### 3. Nature of Relief Sought

The final factor we consider hinges on the nature of the relief which the Complainants seek. In *Arlington Heights II,* the court concluded that "courts ought to be more reluctant to grant relief when the plaintiff seeks to compel the defendant to construct integrated housing or take affirmative steps to ensure that integrated housing is built than when the plaintiff is attempting to build integrated housing on his own land and merely seeks to enjoin the defendant from interfering with that construction." 558 F.2d at 1293.

In *Casa Marie, Inc. v. Superior Court,* 988 F.2d 252, 269 n. 20, (1st Cir.1993) the court, in an elderly and handicapped Title VIII discrimination action, concluded that "Where plaintiff seeks a judgment which would require defendant to take affirmative action to correct a Title VIII violation, plaintiff must make a greater showing of discriminatory effect. On the other hand, if plaintiff seeks a judgment merely enjoining defendant from further interference with the exercise of plaintiff's Title VIII rights, a lesser showing of discriminatory effect would suffice."

## A. Business Necessity

Here, a primary constraint on the application of the disparate impact theory lies in the nature of the "business necessity" or "job relatedness" defense.

Mountain Side contends that even assuming that disparate impact was proven, it was established that the three person per lot occupancy limit was required by a business necessity and that Complainants failed to demonstrate any feasible alternatives that would be less discriminatory.

HUD contends that Mountain Side failed to rebut the prima facie case of disparate impact on the grounds of business necessity. HUD argues that the Secretary applied the correct definition of business necessity when Mountain Side was required to show "compelling need or necessity" not merely "demonstrable relationship to ... legitimate business interests," (Secretary's Third Remand at 9), and that the Secretary's finding that Mountain Side failed to prove a business necessity is supported by substantial evidence in the record.

■■■ Once plaintiffs establish a prima facie case of disparate impact, the burden shifts to the defendant to produce evidence of a "genuine business need" for the challenged practice. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). However, the Supreme Court has repeatedly stated that the "ultimate burden of proving that discrimination against a protected group has been caused by a specific ... practice remains with the plaintiff at all times." *Watson,* 487 U.S. at 997, 108 S.Ct. at 2790. "Thus, when a plaintiff has made out a prima facie case of disparate impact, and when the defendant has met its burden of producing evidence that its [housing] practices are based on legitimate business reasons, the plaintiff must 'show that other [policies], without a similarly undesirable ... effect, would also serve the [defendant's] legitimate interest.'" *Watson,* 487 U.S. at 998, 108 S.Ct. at 2790 (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (citations omitted)).

The Secretary correctly determined that the business necessity standard in Title VIII cases is imported from employment discrimination case law under Title VII. However, the Secretary went beyond the business necessity test that the Supreme Court has enunciated in Title VII cases and incorrectly required that Mountain Side demonstrate a "compelling need or necessity." (Secretary's Third Remand at 10).

When Congress amended Title VII in 1991 one of the purposes of the act was "to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971) and in other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642 [109 S.Ct. 2115, 104 L.Ed.2d 733] (1989)." Civil Rights Act of 1991, Pub.L. No. 102–166, § 3(2), 105 Stat. 1071 (hereinafter "the Act"). The Act placed the burden on the defendant to rebut a showing of disparate impact by demonstrating "that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i). Therefore, we look to *Griggs* and its progeny for direction.

In *Griggs,* the Court concluded that in disparate impact cases "Congress has placed on the employer the burden of showing that any given requirement must have a *manifest relationship to the employment in question.*" 401 U.S. at 432, 91 S.Ct. at 854 (emphasis added). The Court stated that "[t]he touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431, 91 S.Ct. at 853.

■■■ In accordance with *Griggs* and the Act, we hold that for the purposes of Title VIII FHA housing discrimination cases, the defendant must demonstrate that the discriminatory practice has a manifest relationship to the housing in question. A mere insubstantial justification in this regard will not suffice, because such a low standard would permit discrimination to be practiced through the use of spurious, seemingly neutral practices. At the same time, there is no requirement that the defendant establish a

"compelling need or necessity" for the challenged practice to pass muster since this degree of scrutiny would be almost impossible to satisfy.

Mountain Side presented two reasons for the three person per lot occupancy limit: (1) sewer capacity limitations, and (2) concern over quality of park life. In support of the occupancy limit, Mountain Side presented extensive evidence before the ALJ. In his Findings of Fact, the Secretary found: [9]

3. [Mountain Side] employs Prime Management ("Prime") to manage the Park. Edward H. Brooks is Prime's President. The Brooks–Tolz family has built and developed mobile home parks since 1955. Mr. Brooks has been involved in the mobile home industry in various capacities since 1970.

4. Michael Noakes, a Prime employee, has been the property manager for the Park since before March of 1989. Mr. Noakes also manages eight other mobile home parks for Prime.

.    .    .    .    .

11. By March of 1989, [Mountain Side] became aware of the addition of families with children to the classes protected by the [FHA], and that it must decide whether the Park should remain an adult park or whether residency should be thrown open to families with children. At the time, there were many Park vacancies because of the limited market for an adult mobile home community. Accordingly, [Mountain Side] decided that the option of becoming a family park was a more "viable opportunity." However, the elimination of the adult restriction meant that there would be an increase in Park population. Therefore, [Mountain Side], with assistance from Prime, examined instituting occupancy limits.

12. An October 15, 1988, survey of the Park population was used to establish the new policy. According to the study, 318 people resided on 213 lots. Each occupied unit had one or two residents. Mr. Brooks

and Mr. Noakes opined that the condition and age of the utilities, the density of homes, and the overall size of the Park would not support more than a three-person per lot limit without negatively affecting the quality of life at the Park. Accordingly, [Mountain Side] determined that a limit of three residents per unit, resulting in a total of 687 residents, was the maximum number that the Park could reasonably accommodate.

13. Historically, the Park experienced periods of low water pressure and sewer blockages. With a density of almost ten homes per acre, the Park is almost twice as dense as new parks which average five to six homes per acre. Mr. Brooks and Mr. Noakes believed that a population greater than three residents per home would cause overcrowding resulting in a strain on the utilities and a negative effect on the quality of Park life.

14. Neither Mr. Brooks, Mr. Noakes, nor [Mountain Side] considered alternatives other than the occupancy limit to be feasible.

.    .    .    .    .

19. After the imposition of the occupancy limit, [Mountain Side's] counsel advised Mr. Brooks and Mr. Noakes that their own opinion alone might not be sufficient to support the three-person limit and that an independent expert would be able to assist in evaluating the legitimacy of the policy. In early 1991, [Mountain Side] retained QCI Development Services Group, Inc. ("QCI") and its president and principal engineer, Roger Walker, to perform a study to assist [Mountain Side] in evaluating the three-person occupancy limit. Mr. Walker was not provided with any target population limit or instructions concerning methodology. Neither was he requested to provide alternatives or suggestions for improvements or repairs to increase any recommended population limit.

.    .    .    .    .

9. In his Third Initial Decision on Remand and Order, the ALJ adopted the Findings of Fact from his Initial Decision and Order. (Third Initial Decision on Remand and Order at 3 n. 2).

The Secretary adopted these findings when the ALJ's Third Initial Decision on Remand and Order became final upon expiration of the Secretary's 30 day review period.

21. In March 1991, QCI completed its study entitled "Community Guidelines Report, Mountainside Mobile Home Park" ("QCI Study"). It evaluates two sets of concerns which affect Park residents: 1) their health and safety based on an objective evaluation of the infrastructure of the Park (i.e., the adequacy of the Park's water and sewerage pipes), and 2) their comfort based on the size of homes and lots, recreational facilities, and the adequacy of parking.

22. Mr. Walker estimated the adequacy of the Park's sewer system based on repair records and interviews with David Ramstetter, who performed maintenance for the Park. Based on these sources, the Study concluded that sewer pipes were adequate to support a maximum of 916 persons. This figure was arrived at after an estimation of the sufficiency of the sewer system during "peak hours," defined as prior to 8:00 a.m., before people leave for work, and later then 5:00 p.m., after people return home from work. The Study concluded that four people per unit, or a maximum of 916 persons, "puts the sewer system at its capacity...." Because the 916 population limit is a recommended maximum, Mr. Walker opined that if an additional 30 guests are at the Park at peak time, "some portion of the [sewer] system will be overloaded."

23. Mr. Walker described his figure of 916 as a "brick wall," or an absolute maximum. If the Park had 916 residents, he asserted that the sewer system would not be able to accommodate additional visitors. The Park is located in a resort area near the Rocky Mountains. Accordingly, Park residents have numerous seasonal visitors that increase the population during the summer and holiday seasons.

24. Because the recommendation that the Park be limited to 916 individuals was based on interviews with Park personnel rather than actual excavation and examination of the sewerage system, the Study further recommended that the Park conduct a "survey of field conditions" which would cost approximately $4,000. [Mountain Side] did not perform this survey.

. . . . .

26. The QCI Study also made recommendations based on its evaluation of the Park in terms of human comfort. Mr. Walker opined that the Park has "very small lots ... [and is] crowded." Based on the assumption that most of the homes currently in the Park have two bedrooms, the Study recommends a populations limit of two people per bedroom in addition to the previously discussed absolute maximum population of 916. The QCI Study also recommended a limit of two vehicles per trailer for traffic flow and pedestrian safety.

27. Notwithstanding Mr. Walker's recommendation of a maximum of 916 residents, or four residents per home, [Mountain Side] has continued to maintain the limit of three, rather than four, residents per unit. Because of the parking problems, density of the homes, and overall size of the Park, [Mountain Side] decided that the quality of life at the Park would be severely diminished if the Park had a maximum of 916 residents. Furthermore, if the Park reached maximum capacity, it could not accommodate guests, including visiting children.

(Initial Decision and Order at 2–8) (footnotes omitted) (citations to original hearing transcript omitted).

In addition, in his Supplemental Findings of Fact in his Third Initial Decision on Remand and Order, the ALJ found:

13. [Mountain Side] and HUD previously settled two other cases based on the parties' conciliation efforts.... Neither of HUD's conciliation efforts required [Mountain Side] to eliminate or modify the three-person limit. Before establishing the three-person limit, [Mountain Side] contacted HUD, along with legal counsel and representatives of the mobile home industry, to determine whether the occupancy limit would be legal under the amendments to the Fair Housing Act. [Mountain Side] also made later efforts to ensure its legality by renewed communications with these same parties. At no time did any of the parties which [Mountain Side] contacted,

including HUD, advise that the occupancy limitation of three persons per unit violated the Act.

(Third Initial Decision of Remand and Order at 8) (citations to original hearing transcript omitted).

Based on the foregoing findings, Mountain Side demonstrated that the three person occupancy limit has a manifest relationship to housing in the Park.

Our analysis of the three applicable factors, *supra*, leads us to conclude that the Complainants failed to establish a violation of the FHA. Mountain Side overcame Complainants' prima facie case by evidence of legitimate, non-pretextual justifications for its occupancy limitations.

### Conclusion

For the reasons stated above, we **REVERSE** and **REMAND** to the Secretary (1) for entry of an order vacating his order granting judgment in favor of the Complainants, and (2) for entry of an order dismissing the charges of discrimination against petitioners.

HENRY, Circuit Judge, dissenting.

The majority holds it arbitrary and capricious for the Secretary of Housing and Urban Development to conclude that Mountain Side's policy had a discriminatory effect upon families with children and that Mountain Side did not meet the "business necessity" exception to the Fair Housing Act (FHA). I must respectfully dissent for three reasons. First, substantial evidence existed for the Secretary to find that Mountain Side's policy had a discriminatory effect upon families with children. Second, substantial evidence supports the Secretary's finding that the engineering study was a post-hoc justification for a discriminatory policy that actually does not support Mountain Side's position because it proposed a solution that would have allowed the family at issue to continue living in the park. Third, I believe that Congress has already determined the balance between the rights of children and others and that it is not the role of this court to determine whether prohibiting discrimination against children may negatively affect the quality of life in multifamily housing.

Before explaining my dissent, I note that the majority assumes in part IV of its opinion what I believe it should acknowledge: Policies that create a disparate impact upon families with children are prima facie discriminatory. *See, e.g., Casa Marie, Inc. v. Superior Court,* 988 F.2d 252, 269 (1st Cir.1993) (collecting cases); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 935–36 (2d Cir.) (noting confusion surrounding the prima facie case in housing discrimination matters and holding that disparate impact is sufficient to create a prima facie case), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam); *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 986 (4th Cir.1984) (holding that effect alone is sufficient to establish a prima facie case under the FHA). However, whether one assumes, arguendo, or acknowledges that disparate impact is sufficient to state a prima facie case under the FHA, my view is the same. Five people will be evicted from a home they purchased based upon what I believe to be an erroneous application of the law to the facts of this case.

### Statistical Analysis

The majority holds that the Secretary erred by relying upon national statistics. However, without strong evidence showing that the relevant market differs from the national average to such an extent that the three-person limit does not have a disparate impact on families with children, I cannot agree. In my view, the Secretary established a prima facie case of discrimination through the use of statistical evidence, and Mountain Side failed to rebut that case.

According to the record, national census figures show that between 71% and 97% of United States households with four persons or more have minor children. Rec. vol. II, at 38. On the other hand, less than 12% of households with three persons or fewer have minor children. Secretary's Second Remand at 7. Unless we suppose that Mountain Side's market is dramatically different from the national average, it seems clear that its rule limiting occupancy to three-people-per-

unit has a disparate impact upon families with minor children.

However, the majority holds that the Secretary must provide a statistical analysis of Jefferson County, Colorado, in order to rely upon disparate impact. I can find no authority for the proposition that the Secretary must explicitly focus upon the county housing market and family statistics when evaluating a housing discrimination claim. In my view, such a position is inconsistent with Congress's grant of authority to the Secretary, our standard of review, and the approach other courts have taken in the discrimination context. In *Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), the Supreme Court held that when "there was no reason to suppose" a difference between local and national statistics, the district court did not err in using national statistics. In addition, the Ninth Circuit has held that if a plaintiff produces statistical evidence in a Title VII action, "the burden of proof shifts to the employer to prove either that the plaintiff's statistics are inaccurate and no disparity exists, or that the practice is necessary to the efficient operation of the business." *Hung Ping Wang v. Hoffman,* 694 F.2d 1146, 1148 (9th Cir.1982) (citing *Dothard,* 433 U.S. at 338–39, 97 S.Ct. at 2731 (Rehnquist, J., concurring) (other citations omitted)).

Without convincing evidence defining Mountain Side's market and conclusively showing how that market differs materially from national statistics, I do not believe we are in a position to conclude that the Secretary erred by relying upon census data.

### Business Necessity

In addition to holding that the Secretary erred by relying upon the government's statistical evidence to find that Mountain Side's policy had a discriminatory impact upon children under the FHA, the majority holds that the Secretary erred by finding that Mountain Side did not have a business necessity to engage in activities that disparately impacted a protected class.[1] I cannot agree.

Prior to 1988, Mountain Side prohibited children from living in its park. In 1988, however, Congress passed legislation preventing landlords from maintaining adults-only properties, except under limited and specific circumstances. Fair Housing Amendments Act of 1988, Pub.L. No. 100–430, §§ 6(b)(1)–(2), 6(d)(2), 102 Stat. 1619, 1622, 1623 (codified at 42 U.S.C. §§ 3604(a)–(e), 3607(b)(1)). During the week before the legislation went into effect, Mountain Side revoked its adults-only policy and instituted a three-person-per-unit limit. *After* adopting this new policy, and at the suggestion of legal counsel, Mountain Side retained a consultant and initiated its study. Rec. vol. III, at 234–35. The study concluded that the existing sewage system could support 916 residents.[2] In 1991, however, the park had only 341 residents. In addition to being well below the limit its expert concluded the infrastructure can support, Mountain Side failed to follow its own expert's advice. The expert suggested a policy that limited occupancy to two-people-per-bedroom in each unit. Under this policy, the family in this case would have been permitted to live in their three-bedroom unit. Mountain Side itself, moreover, argues that larger families do not usually want to live in mobile home parks, thus suggesting that rapid growth is unlikely. Given the timing of the policy change from adults-only to a three-person-per-unit limit, the timing

---

1. The majority rejects the government's argument that the business necessity defense requires a compelling interest. *See, e.g., Betsey,* 736 F.2d at 988; *see also Gutierrez v. Municipal Court,* 838 F.2d 1031, 1042 (9th Cir.1988) (Title VII), *vacated as moot,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989). Because I find this an easy case under the "manifest relationship" standard of review the majority adopts in this case, I do not consider whether the government's position merits consideration. However, if I did conclude that the Secretary decided this case under an improper standard, I would remand the case to the Secretary to apply the proper standard to the facts of this case. *See King v. Trans World Airlines, Inc.,* 738 F.2d 255, 260 (8th Cir.1984) (remanding Title VII claim to district court to "reevaluate the evidence in light of the proper standard of proof"); *see also Yuckert v. Bowen,* 841 F.2d 303, 307 (9th Cir.1988) (remanding disability case to the Secretary to make findings in accord with proper standard of review).

2. There is no allegation that the occupancy at issue violates any local ordinance.

and substance of the sewer study, Mountain Side's failure to accept its consultant's recommendation on limiting park population, the fact that the population was well below half of the maximum suggested by the consultant in the study upon which Mountain Side relies, and the lack of evidence of a population explosion, I cannot agree that the Secretary erred by rejecting Mountain Side's business necessity defense to the occupancy restriction.

Finally, I believe that the majority's consideration of quality of life at the park is misplaced. Some would argue that the FHA makes an explicit trade-off between the quality of life for children and other citizens. One commentator, for example, suggests that landlords prefer not to provide housing for children, that senior citizens prefer to live in communities without children, and that prohibiting multifamily home providers from discriminating against children may not be socially desirable. *See* James C. Frooman, Comment, *Statutory Analysis of The Familial Status Provision of The Fair Housing Amendments of 1988—Or, "Why Do I Have To Live With Those Curtain–Climbing Rug Rats?"*, 17 N.Ky.L.Rev. 215 (1989).[3] However, Congress chose to protect children and resolved this question in favor of nondiscrimination.

From the time of *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the courts have realized that public policy concerns are relevant in housing law. Congress's desire to prohibit discrimination against children is certainly appropriate in cases of multifamily housing developments that require significant and disproportionate outlays of public resources to provide police, fire, health, and other public services. Congress has recognized that multifamily housing providers who enjoy this public subsidy must meet certain standards in exchange for entering this potentially lucrative market. The FHA seeks to prohibit discrimination against families with children in multifamily housing, and I believe that is an appropriate exercise of congressional power. I would

**3.** It is ironic that the business necessity exception results in such economically inefficient results in this case. If two family members do not move, the family will have to move and sell their home.

therefore affirm the decision of the Secretary.

The park will then have one less tenant and both parties will suffer the transaction costs involved in the dislocation.