*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0463p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GRAOCH ASSOCIATES #33, L. P., d/b/a Autumn Run
Apartments,

*Plaintiff-Appellee,*

*v.*

LOUISVILLE/JEFFERSON COUNTY METRO HUMAN
RELATIONS COMMISSION,

*Defendant-Appellant.*

No. 06-5561

>

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 05-00113—Charles R. Simpson III, District Judge.

Argued: January 23, 2007

Decided and Filed: November 21, 2007

Before: BOGGS, Chief Judge; and MERRITT and MOORE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Kunga Njuguna, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellant. Bradley E. Cunningham, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee. **ON BRIEF:** Kunga Njuguna, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellant. Bradley E. Cunningham, Kenneth S. Handmaker, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee.

BOGGS, C. J., delivered the opinion of the court. MERRITT, J. (p. 11), delivered a separate opinion concurring in the judgment and in Section IV. MOORE, J. (pp. 12-24), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

BOGGS, Chief Judge. The Section 8 voucher program is a voluntary program through which the federal government provides rent subsidies to eligible low-income families who rent from participating landlords. *See* 42 U.S.C. § 1437f(a). The Fair Housing Act, also known as Title VIII, bars discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race . . . ." 42 U.S.C. § 3604(b). In this case, Graoch, the owner of Autumn Run Apartments in Louisville, seeks a declaratory judgment that it did not violate the FHA by

withdrawing from the Section 8 program. Its claim presents two questions regarding the interplay between Section 8 and the FHA. First, can a landlord's withdrawal from the Section 8 program ever violate the FHA solely because it has a disparate impact on members of a protected class? Second, if so, what are the standards for measuring disparate impact?

The district court answered the first question in the negative and therefore granted summary judgment in favor of Graoch without reaching the second question. We reach the same final result, but in a different way. Disagreeing with the position taken by the Second and Seventh Circuits, we hold that a plaintiff can, in principle, rely on evidence of some instances of disparate impact to show that a landlord violated the Fair Housing Act by withdrawing from Section 8. We also hold, however, that in this case the Metro Human Relations Commission did not even allege facts making the statistical comparison necessary to state a prima facie case of disparate-impact discrimination. Consequently, we affirm.

I

The Housing Authority of Jefferson County ("HAJC") coordinates the local disbursement of Section 8 funds in the Louisville area. *See* 42 U.S.C. § 1437f(b)(1) ("The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section."). In March 2003, Graoch notified the HAJC that it intended to withdraw from the Section 8 voucher program, stating that it would honor existing leases by Section 8 tenants but would not renew those leases or sign any new Section 8 leases.

The Kentucky Fair Housing Council ("FHC") and three Autumn Run tenants receiving Section 8 assistance – Joyce McNealy, Tina Gray, and Angela Thornton – filed a complaint with the Metro Human Relations Commission. The Commission found probable cause to believe that Graoch's withdrawal from the Section 8 program constituted unlawful racial discrimination because it had a disparate impact on blacks. On Graoch's motion, it then stayed administrative proceedings to give Graoch the opportunity to seek declaratory relief in federal court. Graoch responded by initiating this case.[1]

The parties agreed to a series of factual stipulations. Eighteen families receiving Section 8 assistance lived at Autumn Run when Graoch announced that it was withdrawing from the Section 8 program. Seventeen of those families were black. As of 2003, 6,270 of the 8,849 Jefferson County residents receiving Section 8 vouchers were black. Finally, as of the 2000 census, 18.9% of Jefferson County residents were black and 24% were members of black households. Absent from the joint stipulations, however, was any information regarding the races of the non-Section 8 tenants at Autumn Run. Indeed, the only reference contained in the record to the racial makeup of Autumn Run as a whole, or of its non-Section 8 tenants, is a remark by Graoch's counsel, quoted by the Commission in its probable cause finding: "the tenants at Respondent project Autumn Run Apartments were 90% minority and 10% white."

Graoch stated that it chose to withdraw from the Section 8 program because of disputes with the HAJC regarding rent payments made on behalf of Section 8 tenants. Graoch claimed that the HAJC held Graoch "to an impossible standard" in enforcing the quality standards for Section 8, "abating rent for conditions which Graoch was either not made aware of prior to inspection, or which it attempted to fix only to be cited upon re-inspection for not making its repairs to the

---

[1]Graoch named only the Commission as a defendant; the FHC moved to intervene as of right, but the district court denied that motion.

arbitrary satisfaction of the inspector." *See* 24 C.F.R. § 982.401 (stating "the housing quality standards . . . for housing assisted" through the Section 8 program).

Based on this record, Graoch moved for summary judgment. First, it argued that the Commission failed to state a prima facie case that Graoch's withdrawal from Section 8 violated the FHA because it had a disparate impact on blacks. Second, it argued that its withdrawal from Section 8 did not violate the FHA even if the Commission did state a prima facie case because the decision to withdraw resulted from a "business necessity." The district court granted summary judgment for Graoch, holding that a party offering only evidence that a landlord's withdrawal from the Section 8 program had a disparate impact on members of a protected class cannot establish a prima facie case that the landlord violated the FHA.

The Commission appealed. We review the district court's decision *de novo*. *See Trustees of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Ordinarily, we may affirm a grant of summary judgment on any basis fairly presented by the record, as long as the opposing party "is not denied an opportunity to respond to the new theory." *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981). In this case, however, both parties agree that we should remand the case to the district court if it is necessary to consider the adequacy of Graoch's business justification for its withdrawal from Section 8. As a result, we consider only whether the Commission has stated a prima facie case.

II

Before delving into the specific implications of withdrawal from Section 8 and the even-more-specific details of this case, we must address as a general matter the law governing disparate-impact claims under the FHA. We previously have held that a plaintiff can establish a violation of the FHA by showing either disparate treatment or disparate impact.[2] *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996). We have stated that, to show disparate impact, a plaintiff must demonstrate that a facially neutral policy or practice has the effect of discriminating against a protected class of which the plaintiff is a member. *Blaz v. Barberton Garden Apartment,* No. 91-3896, 1992 U.S. App. LEXIS 18508, at *8 (6th Cir. July 29, 1992) (unpublished). We have not decided, however, what framework we should use to determine whether a plaintiff has done enough to survive summary judgment on a disparate-impact claim against a private defendant under the FHA.

We find it useful to compare the frameworks that we have applied to three similar kinds of claims: disparate-treatment claims against private defendants under the FHA, disparate-impact claims against private defendants under Title VII, and disparate-impact claims against governmental defendants under the FHA. In disparate-treatment cases under the FHA, we apply "the three-part burden of proof test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Selden Apartments v. U.S. Dep't of Hous. & Urban Dev.*, 785 F.2d 152, 159 (6th Cir. 1986) (internal citation and quotation marks omitted). First, the plaintiff must state a prima facie case by showing that he is a member of a protected class, that he applied to and was qualified to rent or purchase certain housing, that he was rejected, and that the housing remained available thereafter. *Maki v.*

---

[2]Although Graoch is the plaintiff in this declaratory judgment action, when discussing a generic claim we use "plaintiff" to refer to the party alleging a violation of the FHA and "defendant" to refer to the party that allegedly violated the FHA.

*Laakko*, 88 F.3d 361, 364 (6th Cir. 1996). Second, the defendant may then articulate a legitimate non-discriminatory basis for its challenged decision. *Selden Apartments*, 785 F.2d at 160. Third, if the defendant does proffer such a basis, the plaintiff must establish that the articulated reason is pretextual. *Ibid.* The burden of persuasion always remains with the plaintiff.

We imported this framework from our disparate-treatment cases under Title VII. *See Larkin*, 89 F.3d at 289; *compare Daniels v. Bd. of Educ.*, 805 F.2d 203, 207 (6th Cir. 1986) (addressing a disparate-treatment claim under Title VII) *with Selden*, 785 F.2d at 159 (applying the same framework to a disparate-treatment claim under the FHA). We agreed with the reasoning used by the Second Circuit, which found "persuasive" the "parallel between Title VII and Title VIII":

> The two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination; the Supreme Court has held that both statutes must be construed expansively to implement that goal. *See, e.g., Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211-12 (1972) (Fair Housing Act must be generously construed to foster integration); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-36 (1971) (Title VII should be interpreted broadly to achieve equal employment opportunity). Courts and commentators have observed that the two statutes require similar proof to establish a violation.

*Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.), *aff'd on other grounds*, 485 U.S. 18 (1988) (cited in *Blaz*, 1992 U.S. App. LEXIS 18508, at *8, and *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995), which in turn was cited in *Larkin*, 89 F.3d at 289). In sum, we concluded that we generally should evaluate claims under the FHA by analogizing them to comparable claims under Title VII. *Larkin*, 89 F.3d at 289.

In disparate-impact cases under Title VII, we apply a different version of the *McDonnell Douglas* burden-shifting framework than in disparate-treatment cases. We follow the same three steps: the plaintiff states a prima facie case; the defendant responds; the plaintiff rebuts the response. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000). To state a prima facie case, however, a Title VII plaintiff basing his claim on disparate impact must "identify[] and challeng[e] a specific employment practice, and then show an adverse effect by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." *Ibid.* To respond, the defendant must articulate a "legitimate business reason" for the challenged decision, rather than simply a non-discriminatory basis. *Ibid.* Finally, to rebut the defendant's response, the plaintiff can show "either that the employer's reason is a pretext for discrimination, or that there exists an alternative employment practice that would achieve the same business ends with a less discriminatory impact." *Ibid.* Relying on the analogy between Title VII and the FHA, several other circuits have applied essentially this approach to disparate-impact claims under the FHA. *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 98-102 (2d Cir. 2000); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000); *Mountain Side Mobile Estates P'ship* v. *Sec'y of Hous. & Urban Dev. ex rel. VanLoozenoord*, 56 F.3d 1243, 1251 (10th Cir. 1995). So has a district court in our circuit. *Marbly v. Home Props. of N.Y.*, 205 F. Supp. 2d 736, 740 (E.D. Mich. 2002).

In a disparate-impact case against a governmental defendant under the FHA, however, we did not mention the burden-shifting framework or the elements of a prima facie case. *See Arthur v. City of Toledo*, 782 F.2d 565, 575-78 (6th Cir. 1986). Instead, we stated that, to determine "whether conduct which produces a discriminatory effect but which did not have a discriminatory intent" violates the FHA, we must consider three factors: (1) the strength of the plaintiff's showing of discriminatory effect; (2) the strength of the defendant's interest in taking the challenged action; and (3) whether the plaintiff seeks to compel the defendant affirmatively to provide housing for

members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. *Id.* at 575 (adopting a modified version of the four-factor standard used in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) ("*Arlington Heights II*")).[3] Neither our opinion in *Arthur* nor the Seventh Circuit's opinion in *Arlington Heights II* makes clear whether this three-factor balancing approach is the way to evaluate the claim as a whole after the parties have completed all three steps in the burden-shifting framework, or whether the burden-shifting framework does not apply. *Compare 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 680 (D.C. Cir. 2006) (contrasting "the Seventh Circuit's four-factor inquiry" to "the Second Circuit['s] . . . burden-shifting framework," thereby indicating it reads *Arlington Heights II* not to require a prima facie case) *with Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 n.32 (3d Cir. 1977) ("We read the Seventh Circuit's opinion in *Arlington Heights II* as requiring no more than we do in order for a plaintiff to establish a prima facie case . . . . To the extent that the Seventh Circuit would seem to go beyond this standard in its statement of 'critical factors,' our impression is that the court is setting forth a standard upon which ultimate Title VIII relief may be predicated, rather than indicating the point at which the evidentiary burden of justifying a discriminatory effect will shift to the defendant.").

In formulating a framework to analyze disparate-impact claims against private defendants under the FHA, we think that it is best to merge the approaches we used in *Arthur* and in our Title VII disparate-impact cases by reading the *Arthur* standard as a supplement, not an alternative, to the burden-shifting framework. Treating the *Arthur* standard as an alternative would conflict with our statement in *Larkin* that similar claims under Title VII and the FHA generally should receive similar treatment. *See Larkin*, 89 F.3d at 289. And when applied to private defendants, the *Arthur* standard nicely captures the inquiry that we must perform at the third step in the burden-shifting framework. To determine whether a defendant's proffered business reason is a pretext for discrimination, or whether an alternative practice exists that would achieve the same business ends with a less discriminatory impact, we must consider the strength of the plaintiff's statistical evidence of disparate impact and the strength of the defendant's interest in maintaining the challenged practice. Those are the first two *Arthur* factors. The third *Arthur* factor, distinguishing defendants who wish only not to provide housing themselves from those who wish to stop others from providing housing, is not relevant to claims against private defendants, who lack the authority to control third-party behavior (though it is relevant when applied to governmental defendants, who through zoning regulations or land-use permit requirements might have the authority to control the housing development and allocation decisions of third parties). Consequently, we think that our approaches to disparate-impact claims under Title VII and disparate-impact claims against governmental defendants under the FHA are compatible, not inconsistent.

Borrowing from our Title VII cases, then, we hold that disparate-impact claims against private defendants under the FHA should be analyzed using a form of the *McDonnell Douglas* burden-shifting framework:

- First, a plaintiff must make a prima facie case of discrimination by "identifying and challenging a specific [housing] practice, and then show[ing] an adverse effect by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question," *Kovacevich*, 224 F.3d at 830 (disparate impact claim under Title VII);

---

[3]We followed the same procedure in another case involving a disparate-impact claim against a governmental defendant under the FHA. *See Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 640 (6th Cir. 2001). The Supreme Court subsequently granted certiorari in that case, reversed our decision on other grounds, and vacated our decision regarding the plaintiff's FHA claim because the plaintiff abandoned that claim before the Supreme Court. *See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 199-200 (2003).

- Second, if the plaintiff makes a prima facie case, the defendant must offer a "legitimate business reason" for the challenged practice, *ibid.*;

- Third, if the defendant offers such a reason, the plaintiff must demonstrate that the defendant's reason is "a pretext for discrimination, or that there exists an alternative [housing] practice that would achieve the same business ends with a less discriminatory impact." *Ibid.* In order to evaluate the plaintiff's showing, we consider the strength of the plaintiff's showing of discriminatory effect against the strength of the defendant's interest in taking the challenged action. *See Arthur*, 782 F.2d at 575 (disparate-impact claim against a governmental defendant under the FHA).

III

Graoch argues that, instead of analyzing the Commission's claims through this burden-shifting framework, we should exempt landlords from any possible liability under the FHA for a complete withdrawal from the Section 8 voucher program.[4] The Second Circuit, in *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir. 1998), and the Seventh Circuit, in *Knapp v. Eagle Property Management Corp.*, 54 F.3d 1272 (7th Cir. 1995), have created such a categorical exemption for Section 8 withdrawals. We decline to do so.

The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race . . . ." 42 U.S.C. § 3604(b). The Supreme Court held that Title VII, which uses similar language, "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). The same analysis justifies the existence of disparate-impact liability under the FHA. "What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to [access to housing] when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Ibid.* (discussing Title VII).

Of course, not every housing practice that has a disparate impact is illegal. We use the burden-shifting framework described above – and especially the final inquiry considering the strength of the plaintiff's statistical evidence and the strength of the defendant's business reason – to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests. Our analysis is derived from our interpretation of the statute, and we cannot create categorical exemptions from it without a statutory basis.

In *Knapp* and *Salute*, our sister circuits seem to have taken a more circumscribed view of disparate-impact liability under the FHA. The *Knapp* court stated:

> "[T]he courts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute." [*Arlington Heights II*,] 558 F.2d at 1290. . . . [T]his court has recognized that disparate impact analysis is not appropriate in certain contexts. *See NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) (claim alleging failure to insure in certain areas violated the Act not conducive to disparate-impact analysis), *cert. denied*, 508 U.S. 907, 113 S. Ct. 2335, 124 L. Ed. 2d 247 (1993); *Village of Bellwood*

---

[4]Even were we to accept this argument, landlords still could face liability under a disparate-treatment theory, as opposed to a disparate-impact theory, if they refused to accept Section 8 vouchers from some tenants (who were predominantly black) but accepted Section 8 vouchers from others (who were predominantly white).

> *v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir. 1990) ("Some practices lend themselves
> to disparate impact method, others not.").

*Knapp*, 54 F.3d at 1280. This passage appears to say that some disparate-impact claims should fail even if the plaintiff could prevail under the standard burden-shifting framework. We cannot endorse this view.

When we adjudicate statutory claims, "our role is limited to interpreting what Congress may do and has done." *Patterson v. McLean Credit Union*, 491 U.S. 164, 188 (1989). While reasonable minds could disagree as to whether the FHA contemplates disparate impact liability, we have concluded that it does. *See Larkin*, 89 F.3d at 289; *Arthur*, 782 F.2d at 575. Nothing in the text of the FHA instructs us to create practice-specific exceptions. Absent such instruction, we lack the authority to evaluate the pros and cons of allowing disparate-impact claims challenging a particular housing practice and to prohibit claims that we believe to be unwise as a matter of social policy. *Accord Salute*, 136 F.3d at 312 & n.23 (Calabresi, J., dissenting) (expressing "doubt whether the Seventh Circuit's approach" in *Knapp* is "consistent with" the general use of the burden-shifting framework to analyze disparate-impact claims under the FHA).

The passage from *Knapp* also could mean something more limited: that if *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice. This reading is consistent with our statement that "at least under some circumstances a violation of [the Fair Housing Act] can be established by a showing of discriminatory effect without a showing of discriminatory intent." *Arthur*, 782 F.2d at 574 (quoting *Arlington Heights II*, 558 F.2d at 1290) (alteration in original). It is also consistent with the cases relied on by the Seventh Circuit in *Knapp*. In *NAACP v. American Family Mutual Insurance Co.*, for example, the court held that insurers never can face disparate-impact liability for "charging higher rates or declining to write insurance for people who live in particular areas," reasoning that "[i]nsurance works best when the risks in the pool have similar characteristics." 978 F.2d at 290. Conducting an inquiry analogous to our inquiry at the third step in the burden-shifting framework, it concluded that the strength of the insurer's interest in declining to insure in certain areas outweighed the strength of any possible disparate impact the policy could have. *See id.* at 290-91.

Likewise, in *Village of Bellwood v. Dwivedi*, the court concluded that claims of "racial steering" were not subject to disparate-impact analysis because racial steering necessarily involves disparate treatment, not a facially neutral policy that has a discriminatory effect. 895 F.2d at 1533. We agree that categorical bars are justified when they result from a generalized application of the burden-shifting framework. We see no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success (for example, when a plaintiff brings a disparate-impact challenge to a landlord's decision to charge rent).

We do not believe, however, that it is impossible for a disparate-impact challenge to a landlord's withdrawal from Section 8 to succeed under the burden-shifting framework. Consider the strongest possible disparate-impact challenge to a landlord's withdrawal from Section 8: All of the non-Section 8 tenants at a housing complex are white. The landlord decides to participate in the Section 8 voucher program. A number of Section 8 participants move in, including the plaintiff. All are black. The landlord quickly decides to withdraw from Section 8 and refuses to renew the leases of existing Section 8 tenants. He explains his decision by saying simply that he no longer wished to participate in the program, without claiming that his participation cost him money, time, business opportunities, or any other benefit.

At the first stage of the burden-shifting framework, the hypothetical plaintiff could state a prima facie case: she could identify a challenged practice (the landlord's withdrawal from Section 8) and present strong statistical evidence that the practice had a disparate impact on blacks. At the second stage of the burden-shifting framework, the landlord could offer a business reason for his decision: he wanted out of the Section 8 program. At the third stage, then, the plaintiff would have to show either that the landlord's explanation was a pretext for discrimination or that an alternate practice would serve the same business ends with less discriminatory effect. To evaluate the plaintiff's showing, we would consider the strength of her evidence of disparate impact and the strength of the business interests stated by the landlord. We have little doubt that a reasonable fact-finder presented with this hypothetical set of facts could conclude that the landlord's withdrawal from Section 8 was pretextual, and therefore that the plaintiff's claim should survive summary judgment under the burden-shifting framework.

Graoch makes two arguments that could undermine this conclusion. First, it contends that because Section 8 is a voluntary program we should place exceptional weight on a landlord's interest in being able to withdraw without the threat of litigation. Yet to say that Section 8 participation is "voluntary" is only to say that a landlord does not break the law by declining to participate.[5] As such, Graoch's claim proves too much: almost every action that could create disparate-impact liability under the FHA is voluntary. *Cf. Buckeye*, 263 F.3d at 631-32 (vacated) (approving building site plans); *Maki*, 88 F.3d at 64 (varying of rent based on number of occupants). The mere fact that a landlord *often* can withdraw from Section 8 without violating the terms of Section 8 or the FHA does not mean that withdrawal from Section 8 *never* can constitute a violation of the FHA.

Second, Graoch claims that there is no coherent way to permit disparate-impact challenges to a landlord's withdrawal from Section 8 without also permitting such challenges to a landlord's non-participation in Section 8. It reasons that "[t]he actions of both non-participating and participating owners have the same impact on minorities" and therefore that "no principled way exists" to distinguish the two groups. *Knapp*, 54 F.3d at 1280. While we agree that a landlord should never face disparate-impact liability for non-participation in Section 8, we do not think that withdrawal and non-participation are functionally identical. Withdrawal affects an identifiable group: tenants receiving Section 8 assistance. Non-participation could be said to have a theoretical impact on members of a protected class, but the size and composition of the affected group is indeterminate.

Moreover, the FHA does not impose liability based solely on the existence of a disparate impact. It imposes liability only when a plaintiff can meet the ultimate burden of persuasion by showing either that the landlord's business reason for a practice is a pretext for discrimination or that an alternative practice would serve the same business goal with less discriminatory effect. That burden is harder to meet in a challenge to non-participation than in a challenge to withdrawal. A non-participating landlord presumptively can appeal to his interests in not wanting to spend time learning about the program and not wanting to become entangled in government bureaucracy, while a withdrawing landlord who fails to cite any reason why participation in Section 8 hurt his business cannot do so. And an unexplained withdrawal from Section 8, combined with strong evidence of

---

[5]Nothing in the language of Section 8 indicates that, in making the program voluntary, Congress intended to do more than give landlords the option not to participate. Although Congress created the Section 8 program six years after passing the FHA, *see* Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 653 (codified as amended at 42 U.S.C. §§ 1437-37f), it did not include language indicating that Section 8 landlords should be exempt from any FHA requirements. Nor did Congress add any exceptions to the FHA when it later amended Section 8 "to minimize the burdens of Section 8 participation in order to make the program more attractive to landlords." *Salute*, 136 F.3d at 298 (discussing the passage of Pub. L. No. 104-134, § 203(a), (d), 110 Stat. 1321 (1996)).

disparate impact, might permit a fact-finder to infer that a landlord entered Section 8 expecting to attract Section 8 tenants of one race, then withdrew based on discriminatory animus when she instead attracted tenants of a different race. Thus, our view that it is possible to bring disparate-impact challenges to withdrawals from Section 8 is consistent with our view that one cannot bring a disparate-impact challenge to Section 8 non-participation.

IV

Because we reject a categorical rule against disparate-impact challenges to withdrawals from Section 8, we must address whether the Commission can state a prima facie case of disparate impact discrimination against Graoch in this case. To state a prima facie case of disparate-impact discrimination under the FHA, a plaintiff must (1) identify and challenge a specific housing practice, and then (2) show that the practice had an adverse effect on members of a protected class by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question. The Commission plainly satisfied the first requirement by identifying and challenging Graoch's practice of no longer accepting Section 8 vouchers. We conclude that it did not satisfy the second requirement, however, because it failed even to allege any facts making the statistical comparison necessary to determine whether Graoch's withdrawal from Section 8 had a disparate impact on blacks.

In *Arthur*, we explained that there are "two types of discriminatory effects which a facially neutral housing decision can have":

> The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.

782 F.2d at 575 (citing *Arlington Heights II*, 558 F.2d at 1290). In a disparate-impact case under the FHA, a plaintiff must present statistical evidence showing the existence of at least one of the two effects to state a prima facie case. Here, the Commission presented three pieces of data: seventeen of the eighteen families who received Section 8 assistance and lived at Autumn Run when Graoch announced its withdrawal are black; as of 2003, 6,270 of the 8,849 Jefferson County residents receiving Section 8 vouchers were black; and as of the 2000 census, 18.9% of Jefferson County residents were black and 24% were members of black households. It made no other allegations regarding the racial makeup of Autumn Run or the surrounding community.

To determine whether a plaintiff can show the first type of discriminatory effect described in *Arthur*, "[t]he correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group *to which the policy was applied*." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984) (emphasis added); *cf. Isabel v. City of Memphis*, 404 F.3d 404, 412 (6th Cir. 2005) (applying essentially the same inquiry in a Title VII case). In *Betsey*, a landlord managing several adjacent buildings adopted a policy banning children from Building Three. 736 F.2d at 985. The policy led to the eviction of 54.3% of the non-white tenants in Building Three, but only 14.1% of white tenants. *Id.* at 988. Relying on the discrepancy between those percentages, the court held that the plaintiffs had made a prima facie case even though "the percentage of blacks at [the apartment complex as a whole] continues to exceed by a substantial margin both the percentage of black renters in the election district in which [the complex] is located as well as in Montgomery County as a whole." *Id.* at 986-87. This approach respects the common-sense notion that a policy applied to a population that is 95 percent black does not have a disproportionate adverse effect on blacks even if 90 percent of the people it burdens are black.

Here, Graoch applied its "no Section 8" policy to all residents of Autumn Run. Consequently, to determine whether the policy had a greater adverse effect on blacks than whites, we should compare the percentage of blacks among the Section 8 tenants whose leases were not renewed (about 94 percent) to the percentage of blacks among the total pool of tenants at Autumn Run. Yet the Commission has not presented any data regarding the total tenant pool and has not even alleged that there are more whites among the non-Section 8 tenants than among the Section 8 tenants. The only information we have about Autumn Run's non-Section 8 tenants is an isolated comment by Graoch's lawyer that "the tenants at Respondent project Autumn Run Apartments were 90% minority and 10% white." If we consider this information (which the Commission does not dispute), it indicates that the racial mix of Autumn Run's Section 8 and non-Section 8 tenants was essentially the same, overwhelmingly non-white. Because the Commission has not even alleged – and very likely could not show – that Graoch's withdrawal from Section 8 harmed a disproportionate percentage of the black tenants at Autumn Run, we conclude that the Commission has not stated a prima facie case based on the first type of discriminatory effect. There can be no prima facie case of *racial* disparate impact without a showing of adverse impact on a racial group. For all that the Commission alleges, any vacancies caused by non-renewal of Section 8 leases to black tenants will be filled by black non-Section 8 tenants, who already fill the very large majority of Autumn Run's apartments.

The Commission has not stated a prima facie case based on the second type of discriminatory effect either. It has never claimed that Graoch's withdrawal from Section 8 had a segregative effect nor alleged any facts from which we could infer a segregative effect: it has not provided any information about the racial makeup of the community surrounding Autumn Run or about the likely effect of withdrawal on the racial makeup of Autumn Run itself.

Because the Commission cannot meet its burden at the first step of the burden-shifting framework, its case cannot go forward. Graoch is not required to present a legitimate business reason justifying its decision to withdraw from Section 8.

V

For the foregoing reasons, the district court's grant of summary judgment in favor of Graoch is affirmed.

───────────────────────────────────────────────

## CONCURRING IN THE JUDGMENT AND SECTION IV

───────────────────────────────────────────────

MERRITT, Circuit Judge, concurring. I concur in the judgment in this case and in Section IV of Judge Boggs's opinion. I am not sure whether "disparate impact" analysis can "ever" apply to refusals to enter or remain in Section 8 housing because I am unable to foresee the full spectrum of such cases that could arise in the future. But I agree that there is no valid discrimination case here. The owner apparently became irritated by certain requirements the local housing administrator imposed on him, requirements he apparently regarded as too onerous, time consuming and costly. So he withdrew. This apparently angered the administrator and the Commission, and they accused him of discrimination. This seems to be the underlying situation. The local administrative body should have to show either an intent to discriminate based on race or such a significant racial impact that intent can be inferred or that serious harm to a racial minority is likely to occur. None of these elements are present here.

---

### CONCURRING IN PART, DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. Defendant-Appellant the Louisville/Jefferson County Metro Human Relations Commission ("MHRC") appeals from the district court's order denying its motion for summary judgment and granting summary judgment to Plaintiff-Appellee Graoch Associates #33 ("Graoch"). For the reasons set forth below, I concur in the lead opinion's conclusion that a landlord's withdrawal from the Section 8 program may give rise to a disparate-impact claim under the Fair Housing Act ("FHA"), Title VIII of the Civil Rights Act of 1968, codified as amended at 42 U.S.C. §§ 3601-3631. But I differ in the analytical framework that I think this court should apply to FHA disparate-impact claims against private entities. In the instant case, Graoch has conceded that MHRC has established a prima facie case of disparate impact under the FHA. I therefore think this court should reverse the grant of summary judgment to Graoch. Because the district court offered no reason for denying MHRC's cross-motion for summary judgment, other than the grant of Graoch's motion, I believe this court should vacate the part of the district court's order denying MHRC's motion for summary judgment. Insufficient evidence exists for us to rule as a matter of law on whether Graoch successfully rebutted MHRC's prima facie case by showing that withdrawal from the Section 8 program constitutes a business necessity. I therefore believe this court should remand for further proceedings.

### I. BACKGROUND

The Section 8 tenant-based housing-assistance program aids low-income families in obtaining housing in the private market. 42 U.S.C. § 1437f(a). Local public-housing agencies receive federal funds to administer the program. 42 U.S.C. § 1437f(b)(1). These agencies issue vouchers to families who then independently find suitable rental housing provided by private owners voluntarily participating in the program. 42 U.S.C. § 1437f(o)(6)(B). The local housing agency pays the housing subsidy directly to the landlord. Participation in the Section 8 program places legal duties on owners related to the safety, sanitation, and lease-terms of the rental housing they provide. 42 U.S.C. § 1437f(d); 42 U.S.C. § 1437f(o)(7)-(8). Public-housing agencies set "the payment standard for each size of dwelling unit in a market area" at not less than ninety percent and not more than 110 percent of "the fair market rental." 42 U.S.C. § 1437f(o)(1)(B). The monthly assistance for a family is equal to the amount by which the "payment standard" rent determined by the public housing agency exceeds either thirty percent of the monthly adjusted income or ten percent of the monthly income of the family, whichever is greater. A tenant, however, must pay the difference between his or her subsidy and actual rent, no matter the amount of the payment standard rent. 42 U.S.C. § 1437f(o)(2)(A); Alfred M. Clark III, *Can America Afford to Abandon a National Housing Policy?* 6 J. AFFORD. HOUS. & CMTY. DEV. L. 185, 188 (1997).

The Housing Authority of Jefferson County administers the Section 8 program in the Louisville area. In March 2003, Graoch, the owner of Autumn Run apartments in Louisville, notified the Housing Authority that it would honor existing leases held by Section 8 tenants but would not renew these leases or sign any new Section 8 leases. Joint Appendix ("J.A.") at 35. Both parties have stipulated the following facts: In 2003, 8,849 tenants in Louisville (including Jefferson County) received Section 8 voucher subsidies, and 6,270 of these tenants were African-Americans. According to the 2000 census, African-American households comprised approximately twenty-four percent and African-Americans comprised approximately nineteen percent of Louisville's total population (also including Jefferson County). When Graoch withdrew from the Section 8 program,

there were eighteen families at Autumn Run receiving Section 8 vouchers, of which seventeen, or approximately ninety-four percent, were African-American families.  J.A. at 31-32.

The Kentucky Fair Housing Council, Inc. and three Autumn Run tenants receiving financial assistance through the Section 8 program filed a complaint with MHRC, which subsequently found probable cause that Graoch's withdrawal constituted unlawful racial discrimination.  J.A. at 56-57, 86.  MHRC stayed administrative proceedings to allow Graoch to seek a declaratory judgment in the U.S. District Court for the Western District of Kentucky that withdrawal from the Section 8 program cannot constitute a violation of the FHA.  J.A. at 65.  The current case involves only Graoch and MHRC and arises from the district court's grant of summary judgment to Graoch.[1]

## II.  DISPARATE IMPACT UNDER THE FHA

### A.  Standard of Review

We must review the district court's order granting summary judgment de novo.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law."  *Macy v. Hopkins County Sch. Bd.*, 484 F.3d 357, 363 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and Fed. R. Civ. P. 56(c)).  We must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Bryson v. Regis Corp.*, ---F.3d---, No. 06-5137, 2007 WL 2326046, at *6 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986)).  Regardless of the evidence put forth by the nonmoving party, the moving party has the burden of establishing that "there is an absence of evidence to support the nonmoving party's case."  *Patmon v. Mich. Supreme Ct.*, 224 F.3d 504, 508 (6th Cir. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Although both sides in this case made cross-motions for summary judgment before the district court, MHRC now appeals the grant of summary judgment to Graoch.  Thus, we must view Graoch as the moving party and MHRC as the nonmoving party.

### B.  Framework for Analysis

Section 3604 of the FHA prohibits discrimination because of, inter alia, race, color, or national origin in the sale or rental of housing by (1) refusing to rent or make available any dwelling; (2) offering discriminatory "terms, conditions, or privileges" of rental; (3) making, printing or publishing "any notice, statement, or advertisement" indicating a preference, limitation, or discrimination based on race, color, or national origin; and (4) representing to any person that "any dwelling is not available for . . . rental when such dwelling is in fact so available."  42 U.S.C. § 3604(a)-(d).  We have previously held that a plaintiff may establish a violation under the FHA by showing that the defendant has an intent to discriminate ("disparate treatment") or that an otherwise neutral practice has a disparate impact on a protected class ("disparate impact").  *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996).  Every one of the ten other circuits to consider the issue has allowed disparate-impact analyses under the FHA.  John F. Stanton, *The Fair Housing*

---

[1] The procedural idiosyncrasies of this case involving a request for declaratory relief have placed the landlord, Graoch, in the position of Plaintiff-Appellee and MHRC in the position of Defendant-Appellant.  In a more standard FHA claim, tenants or a local fair-housing council would be in the position of plaintiff and private landlords or a government entity in the position of defendant.  Because Graoch sought declaratory relief on the question whether a landlord's withdrawal from the Section 8 program could ever constitute a violation of the FHA, my analysis proceeds to consider the appropriate framework for analyzing disparate-impact claims against private defendants.  That Graoch is here technically plaintiff, rather than defendant, is not significant.

*Act and Insurance: An Update and the Question of Disability Discrimination*, 31 HOFSTRA L. REV. 141, 174 n.180 (2002) (listing cases); *cf. 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (assuming without deciding that plaintiffs may bring a disparate-impact claim under the FHA). To prove a disparate-impact claim, a plaintiff need not show any intent to discriminate on the part of the defendant. *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir. 2004) (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989)), *cert. denied*, 543 U.S. 1151 (2005); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995), *cert. denied*, 516 U.S. 1140 (1996).

The appropriate framework for analyzing an FHA disparate-impact claim against a private entity is an issue of first impression in this circuit. I believe that we should analyze these claims according to a framework derived from that which the Fourth Circuit uses to evaluate FHA disparate-impact claims against private defendants as well as that which we use to evaluate Title VII disparate-impact claims. First, we should require a plaintiff to establish a prima facie case by showing that a challenged housing practice or policy has caused a disparate effect on a protected class. Second, if a plaintiff has established a prima facie case, the defendant can avoid liability by proving that the challenged practice constituted a business necessity and that there existed no less discriminatory alternatives that could serve the business interest.

### 1. FHA Disparate-Impact Claims Against Government Defendants

In deriving this standard, I have found it helpful to survey how other circuits treat FHA disparate-impact claims against both government and private entities. The circuits evaluate the claim either by applying a multi-factor test, implementing a burden-shifting framework, or combining the two approaches. In *Metropolitan Housing Development Corp. v. Village of Arlington Heights (Arlington Heights II)*, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978), the first court of appeals case concerning disparate impact under the FHA, the Seventh Circuit stated: "we refuse to conclude that every action which produces discriminatory effects is illegal." *Id.* at 1290.[2] The Seventh Circuit accordingly set forth a four-factor test to determine whether an action producing a disparate effect violates the FHA. Its factors inquire:

> (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [426 U.S. 229 (1976)]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Id.* Five years later, the Fourth Circuit adopted the same four factors in considering an FHA disparate-impact claim against a government entity. *See Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982). The Sixth Circuit subsequently applied the *Arlington Heights II* analysis in a case involving a defendant government entity, but eliminated the assessment of evidence of discriminatory intent because it agreed with the Seventh Circuit that this was "the least important

---

[2]*Arlington Heights II* marked the second time the Seventh Circuit had faced the same action concerning constitutional and statutory challenges to Arlington Heights's zoning law. In *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp. (Arlington Heights I)*, 429 U.S. 252 (1977), the Supreme Court had overturned the Seventh Circuit's recognition of a discriminatory-effects violation of the Equal Protection Clause of the Fourteenth Amendment, holding that the plaintiffs did not show that discriminatory intent motivated the defendants' challenged rezoning decision. *Id.* at 270-71. The Supreme Court, however, remanded the question of liability under the FHA, which the Seventh Circuit had not earlier addressed. *Id.* at 271.

of the four factors." *Arthur v. City of Toledo*, 782 F.2d 565, 575 (6th Cir. 1986) (citing *Arlington Heights II*, 558 F.2d at 1292). *See also Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 640-41 (6th Cir. 2001) (evaluating the factors articulated in *Arthur* to conclude that there existed genuine issues of material fact concerning defendants' liability with respect to a disparate-impact claim under the FHA), *vacated on abandonment of claim*, 538 U.S. 188, 199-200 (2003).

In response to confusion about the stage of litigation at which the *Arlington Heights II* factors came into play, the Second Circuit clarified that courts should consider the factors as part of a "final determination on the merits rather than as a requirement for a prima facie case." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.), *aff'd in part*, 488 U.S. 15 (1988). The Second Circuit reasoned: "treating the four factors as steps necessary to make out a prima facie case places too onerous a burden on [plaintiffs]." *Id.* at 935-36. Drawing on earlier Third Circuit precedent,[3] the Second Circuit established a burden-shifting framework, which considered the *Arlington Heights II* factors "as part of a defendant's justification for its challenged action." *Id.* at 935. The Second Circuit held that plaintiffs should first establish a prima facie case "by showing that the challenged practice of the defendant 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect.'" *Id*. at 934 (quoting *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975)). "The plaintiff need not show that the decision complained of was made with discriminatory intent." *Id*. Once a plaintiff has presented a prima facie case, a defendant "must prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* at 936 (citing *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148-49 (3d Cir. 1977), *cert. denied*, 435 U.S. 908 (1978)).

The Tenth Circuit takes the same approach as *Huntington Branch* in establishing a burden-shifting framework and then weighing the government defendant's justifications against the plaintiff's showing of disparate impact. *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007). Although the Fifth Circuit has not had occasion to develop fully the framework for assessing FHA disparate-impact claims against government entities,[4] at least one district court within the Fifth Circuit follows the *Huntington Branch* analysis. In *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 531-32, 565 (N.D. Tex. 2000), the U.S. District Court for the Northern District of Texas held that once a plaintiff has established a prima facie case of discriminatory effects, the defendant must prove that it acted to further a "legitimate, bona fide governmental interest" as well as prove the absence of a less discriminatory alternative. The court then evaluates the disparate-impact claim by balancing the showing of discriminatory effects against that of the defendant's justifications and by assessing whether the plaintiff seeks to compel or to prevent interference with housing provision. *Id.*

The other circuits that have addressed FHA disparate-impact claims against government defendants have not followed *Huntington Branch*'s framework for incorporating the *Arlington II*

---

[3] Shortly after the *Arlington Heights II* decision, the Third Circuit held in *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977), *cert. denied*, 435 U.S. 908 (1978), that a plaintiff may establish a prima facie case under the FHA "by proving that the [defendants'] acts had a discriminatory effect and that the [defendants] have failed to justify the discriminatory results of their actions."

[4] The Fifth Circuit recognizes disparate-impact claims under the FHA but has at least twice found insufficient evidence to support plaintiffs' prima facie cases and, therefore, has not proceeded beyond that stage of analysis. *United States v. Mitchell*, 580 F.2d 789, 791-92 (5th Cir. 1978) (holding that a plaintiff may produce statistical evidence of discriminatory effects to establish a disparate-impact claim under the FHA); *Bonvillian v. Lawler-Wood Hous., LLC*, No. 07-30181, 2007 WL 2083635 (5th Cir. July 13, 2007) (unpublished opinion) (holding that the closing of an apartment building following Hurricane Katrina did not have a disparate impact on protected classes).

factors into an evaluation of the merits of the defendant's justification for the challenged action. The First, Third, and Eighth Circuits evaluate FHA disparate-impact claims against government entities according to burden-shifting frameworks and do not employ any final balancing test derived from the *Arlington Heights II* factors to evaluate the merits of the defendant's justification. The burden-shifting standards employed by these circuits are similar, with the only significant variation being that the Eighth Circuit requires plaintiffs to prove the existence of a less discriminatory alternative, while the Third Circuit requires defendants to prove the absence of such an alternative; the First Circuit has not yet determined the allocation of this burden. *See Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 902-03 (8th Cir. 2005) (holding that once the plaintiff has established a prima facie case, the defendant "must demonstrate that the proposed action has 'a manifest relationship' to the legitimate, non-discriminatory policy objectives and 'is justifiable on the ground it is necessary to' the attainment of these objectives"; the burden then "shifts back to the plaintiffs to show that a viable alternative means is available to achieve those legitimate policy objectives without discriminatory effects") (quoting *Oti Kaga, Inc. v. South Dakota Hous. Dev. Auth.*, 342 F.3d 871, 883 (8th Cir. 2003)); *Lapid-Laurel, LLC v. Zoning Bd. of Adjustment*, 284 F.3d 442, 467 (3rd Cir. 2002) (holding that once a plaintiff has made out a prima facie case of disparate impact, "then the burden shifts to the defendant to show that it had a legitimate, non-discriminatory reason for the action and that no less discriminatory alternatives were available"); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49-51 (1st Cir. 2000) (finding that "practically all of the case law . . . treats impact as doing no more than creating a *prima facie* case, forcing the defendant to proffer a valid justification" and that further balancing of objectives by judges is inappropriate in disparate-impact cases).

The Ninth and Eleventh Circuits have allowed FHA disparate-impact claims against government entities but have not specified whether they incorporate the *Arlington Heights II* multi-factor test into a burden-shifting framework. *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997); *Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (11th Cir. 1994) (citing *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978)); *Keith v. Volpe*, 858 F.2d 467, 483-84 (9th Cir. 1988), *cert. denied*, 493 U.S. 813 (1989).

## 2. FHA Disparate-Impact Claims Against Private Defendants

Plaintiffs have brought to the federal courts far fewer FHA disparate-impact claims against private entities than they have against public entities. The Fifth Circuit acknowledges the availability of a disparate-impact claim against a private defendant under the FHA, but has not developed a framework for analyzing these claims. *See Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir.) (citing *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986)), *cert. denied*, 519 U.S. 1041 (1996). The Fourth and Tenth Circuits, however, have developed contrasting frameworks for evaluating FHA disparate-impact claims against private entities.[5] The Fourth Circuit has applied a simple burden-shifting framework, holding that "when confronted with a showing of discriminatory impact, defendants must prove a business-necessity sufficiently compelling to justify the challenged practice." *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984). In applying the business-necessity standard to disparate-impact claims against private defendants under the FHA, the Fourth Circuit followed the framework for parallel claims under Title VII.

---

[5]In *United States v. Starrett City Associates*, 840 F.2d 1096, 1101 (2d Cir.), *cert. denied*, 488 U.S. 946 (1988), the Second Circuit refrained from deciding whether the defendant was a private or state actor and evaluated the case as if the defendant were a state actor.

The Tenth Circuit, however, created a different framework for evaluating FHA disparate-impact claims against private defendants that departs from the business-necessity test. Instead, the Tenth Circuit's evaluation of disparate-impact claims against *private* defendants follows the framework that the Sixth Circuit uses to evaluate disparate-impact claims against *public* defendants. In *Mountain Side Mobile Estates Partnership v. Secretary of Housing & Urban Development*, 56 F.3d 1243, 1252 (10th Cir. 1995), the Tenth Circuit held that "a Title VIII prima facie case, once established . . . could alone suffice to prove a Title VIII violation unless the defendants justify the discriminatory effect which has resulted from their challenged actions." The opinion reiterated that "unrebutted proof of discriminatory effect alone may justify a federal equitable response." *Id.* To determine "whether a plaintiff's prima facie case of disparate impact makes out a violation of Title VIII," the Tenth Circuit assesses the three factors we set forth in *Arthur*: the strength of the showing of discriminatory effect; the defendant's interest in taking the action; and whether the plaintiff seeks to compel the defendant to provide housing or alternatively to restrain the defendant from interfering with the provision of housing. *Id.*

### 3. Sixth Circuit Treatment of Title VII Disparate-Impact Claims

In deciding what framework to apply in the instant case, the lead opinion does not look to other circuit courts' treatment of FHA disparate-impact claims for guidance. Instead, the lead opinion integrates the three-factor analysis outlined in *Arthur v. City of Toledo* with the tripartite burden-shifting approach taken in a single Sixth Circuit Title VII disparate-impact case, *Kovacevich v. Kent State Univ.*, 224 F.3d 806 (6th Cir. 2000). In particular, the lead opinion suggests that the first two factors from *Arthur*—the strength of the showing of disparate effects and the strength of the defendant's interest in the challenged practice—should be applied at the pretext stage of analysis. I part company with the lead opinion on two grounds. First, I believe that the appropriate burden-shifting framework for a disparate-impact case is found not in *Kovacevich* but in an earlier Sixth Circuit decision, *Alexander v. Local 496, Laborers' International Union of North America*, 177 F.3d 394 (6th Cir. 1999), *cert. denied*, 528 U.S. 1154 (2000). Second, I believe that the lead opinion improperly applies the factors outlined in *Arthur v. City of Toledo* to an FHA disparate-impact claim involving a private defendant.

The lead opinion is correct in looking to disparate-impact claims against private defendants under Title VII to derive a framework for assessing such claims under the FHA. *See Larkin*, 89 F.3d at 289. The Sixth Circuit's cases on disparate-impact claims under Title VII, however, conflict. *Kovacevich* holds that a once a plaintiff has shown an adverse effect, the burden shifts to the defendants to "articulate a legitimate business reason" for the challenged practice. 224 F.3d at 830. Once the defendant has proffered such a reason, under *Kovacevich* "the burden shifts back to the plaintiff to show either that the [defendant's] reason is a pretext for discrimination, or that there exists an alternative . . . practice that would achieve the same business ends with a less discriminatory impact." *Id.* In contrast, *Alexander* holds that once a plaintiff has established a prima facie case by showing adverse effect, "the burden shifts to the [defendant] to produce evidence that the challenged practice is a business necessity." 177 F.3d at 405-06. The difference between the two opinions lies in the fact that by requiring the plaintiff to prove pretext, *Kovacevich* both imports an intent-oriented principle from the disparate-treatment test into the disparate-impact analysis and places the ultimate burden of persuasion on the plaintiff rather than on the defendant.

*Alexander* offers the better standard for assessing disparate-impact claims against private entities. Moreover, *Alexander* is the earlier opinion, and "when a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case." *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001) (citing *Sowards v. Loudon County*, 203 F.3d 426, 431 n.1 (6th Cir.), *cert. denied*, 531 U.S. 875 (2000), and *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 180 F.3d 758, 765 (6th Cir. 1999), *rev'd on other grounds*,

531 U.S. 288 (2001)).  Pretext does not belong in a disparate-impact case as a matter of principle. As a general matter, the plaintiff's burden to prove pretext involves a showing that the defendant's proffered justification for the challenged action masks actual discriminatory intent.  *Amini v. Oberlin Coll.*, 440 F.3d 350, 359-60 (6th Cir. 2006).  Because a plaintiff does not need to establish discriminatory intent in a disparate-impact case, proof of pretext in such a case would be an unnecessary and indeed absurd undertaking.

Third, the genealogy of the pretext prong in *Kovacevich* renders it suspect.  *Kovacevich* devised the requirement that a plaintiff prove pretext in a Title VII disparate-impact claim from an earlier Sixth Circuit Title VII disparate-impact case, *Scales v. J.C. Bradford & Co.*, 925 F.2d 901 (6th Cir. 1991).  *Scales*, in turn, derived the pretext requirement from a Supreme Court opinion, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988).  The relevant portion of *Watson*, however, does not make a plaintiff's proof of pretext a third stage of the burden-shifting in disparate-impact cases.  Instead, the opinion merely observes that the factors used to assess a plaintiff's showing of a less discriminatory alternative in disparate-impact cases are also ones that determine whether "the challenged practice has operated as the *functional equivalent* of a pretext for discriminatory treatment."  *Watson*, 487 U.S. at 998 (emphasis added).

Moreover, the section of *Watson* cited by *Scales* for the proposition that a plaintiff retains the burden of proof in a disparate-impact claim was issued by a plurality rather than a majority of the Court and is therefore not binding.  In this section of the *Watson* opinion joined only by three other Justices, Justice O'Connor wrote that the plaintiff retains the burden of persuasion at each stage of the burden-shifting inquiry in a disparate-impact case.  *Id.* at 997.  Justice White's majority opinion in *Wards Cove*, 490 U.S. at 660, adopted the position taken by the O'Connor plurality in *Watson*.  The Civil Rights Act of 1991, § 105, 105 Stat. 1074-1075 (1994) (codified as amended at 42 U.S.C. § 2000e-2(k)), however, rejected *Wards Cove*'s holding regarding the allocation of burdens of production and proof in disparate-impact cases.  The interpretive memorandum for the Act, which Congress declared to be its exclusive legislative history, states:  "The terms 'business necessity' and 'job-related' are intended to reflect the concepts enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*."  137 Cong. Rec. 28,680 (1991).  We have clearly interpreted the Civil Rights Act of 1991 to mandate that once a plaintiff has established a prima facie case of disparate effects, "the burden of *persuasion*, not just the burden of production, shifts to the defendant to show a business necessity for the practices with disparate impact."  *Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005) (citing 42 U.S.C. § 2000e-2(k)(1)(A)).

### 4.  Burdens of Proof and the Business-Necessity Defense

"Business necessity" is similarly the appropriate standard for private entities' defense against disparate-impact claims under the FHA.  *See 2922 Sherman Ave. Tenants' Ass'n*, 444 F.2d at 679 (observing that *Griggs* is the "seminal case" on the issue of disparate-impact claims and that, in the employment context, *Griggs* establishes "business necessity" as the sole defense to a showing of disparate effects).  The Secretary of Housing and Urban Development ("HUD") takes the position that implementing regulations promulgated in 1989 established a business-necessity defense to disparate-impact claims.  The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation, 60 Fed. Reg. at 61,866-61,868 (Dec. 1, 1995) (codified at 24 C.F.R. Part 81).

"Business necessity" holds defendants to a higher standard than the more lenient "business justifications" test set forth in *Wards Cove*, 490 U.S. at 659, which defined "the dispositive issue [to be] whether a challenged practice serves, in a significant way, the legitimate [business] goals of the [defendant]."  Between 1989 and 1991, some courts applied the *Wards Cove* standard to FHA cases.

Cases decided after the passage of the Civil Rights Act of 1991, however, implement the "business necessity" test in recognition that the Act overruled the weakened disparate-impact standards set forth in *Wards Cove*. Stanton, *The Fair Housing Act and Insurance*, 31 HOFSTRA L. REV. at 186-87. While a consensus exists that business necessity is the appropriate test, there remains some disagreement as to the content of that standard. The Fourth Circuit, HUD, and district courts within the Ninth Circuit define business necessity to mean a "compelling" business interest; in their allocation of the burdens of proof, the Second and Third Circuit's apply a "substantive equivalent" of this test.[6] *Id.* at 187. I agree that "when confronted with a showing of discriminatory impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice." *See Betsey*, 736 F.2d at 988. Requiring the defendant to prove anything less would contravene the plain meaning of the word "necessity," defined as "an imperative requirement or need for something." Random House Dictionary 1284 (Stuart Berg Flexner, ed., 2d ed. 1993). Moreover, requiring the defendant to offer a mere business justification would confuse defendants' burden of proving business-necessity in disparate-impact cases with defendants' burden of producing a legitimate, nondiscriminatory reason for the challenged action in disparate-treatment cases. *Compare Macy*, 484 F.3d at 364 (discussing the shifting burdens in disparate-treatment cases), *with Alexander*, 177 F.3d at 405-06 (discussing the shifting burdens in disparate-impact cases).

     In articulating the framework for our evaluation of FHA disparate-impact claims against private defendants, I believe that we should rely on our earlier precedent *Alexander*, rather than *Kovacevich*, and seek guidance as well from the Fourth Circuit decision in *Betsey v. Turtle Creek*. Thus, we should first require that plaintiffs establish a prima facie case of disparate effects. Second, upon the showing of a prima facie case, the burden of persuasion then shifts to the defendants, who must prove that the challenged housing practice constitutes a business necessity and that no less discriminatory alternatives are available. In the Title VII context, plaintiffs bear the burden of proving that a less discriminatory alternative exists. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 432 (1975)). The consensus across the circuits, however, is that in the housing context defendants have the burden of proving the absence of a less discriminatory alternative. *See Lapid Laurel, LLC*, 284 F.3d at 467 (discussing the defendant's burden of proof regarding the absence of less discriminatory alternatives); *Langlois*, 207 F.3d at 50 (same); *Huntington Branch, NAACP*, 844 F.2d at 935 (same); *Dews*, 109 F. Supp. 2d at 531-32, 565 (same); *see also Betsey*, 736 F.2d at 988 (holding that once plaintiffs have established a prima facie case, defendants must prove business necessity).

     Our analysis should stop with an evaluation of whether a private defendant has successfully rebutted the plaintiff's showing of disparate effects by proving "business necessity" and the unavailability of a less discriminatory alternative. Considerations of doctrine and policy preclude this court's use of the *Arthur* factors for a government defendant to evaluate an FHA disparate-impact claim against a private defendant. First, the lead opinion applies factors from a case concerning a public defendant to cases against private defendants, without explaining why they are transferable. That the lead opinion needed to excise the third *Arthur* factor from its analysis only highlights the unsuitability of the framework in the context of a case against a private defendant. I believe that the Tenth Circuit incorrectly integrated *Arthur*'s multi-factor test into the "business necessity" framework applicable to private defendants in disparate-impact suits; it did so without even acknowledging that the case concerned a private defendant while *Arthur* concerned a public

---

[6]The Tenth Circuit has rejected an attempt by HUD to define business necessity as a "compelling need or necessity." *Mountain Side*, 56 F.3d at 1254. But in making this determination, the Tenth Circuit closely paraphrased language from Justice O'Connor's plurality opinion in *Watson*. Because I believe that relying on the *Watson* plurality is inappropriate following the Civil Rights Act of 1991, I also refrain from following the standard for business necessity set forth in *Mountain Side*.

defendant. *See Mountain Side*, 56 F.3d at 1252. In contrast, the Fourth Circuit has explicitly stated that the multi-factor analysis derived from *Arlington Heights II* and its progeny should not apply in disparate-impact claims against private defendants. *Betsey*, 736 F.2d at 988 n.5.

Second, by applying the *Arthur* factors, the lead opinion converts an inquiry into the business justification for a practice bearing a disparate impact on a protected class into a balancing test. The lead opinion suggests that this court should weigh the disparate effects of the challenged action against the strength of the defendant's interest in taking the challenged action. Courts appropriately countenance governments' weighing of competing public considerations of deep importance, and they may engage in such balancing acts themselves. *See, e.g.*, *Arthur*, 782 F.2d at 575 (holding that because of "the strong policy considerations underlying referendums . . . absent highly unusual circumstances, the discriminatory effect of a referendum cannot establish a violation of the Fair Housing Act"). In limited instances, Congress has reduced the burden of fair housing laws on government entities, with respect to those entities' pursuit of important public interests, but Congress did not do the same for private landlords. *See Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 746 (9th Cir. 1996) (holding that "Congress chose to give special deference to government-imposed occupancy limits only . . . [and] made no comparable provision for private occupancy policies"). Even if weighing relative strengths of interests were appropriate, we must follow the longstanding rule that the weighing of litigants' competing interests belongs at trial and not at the summary judgment stage. *Crestview Parke Care Ctr. v. Thompson*, 373 F.3d 743, 755 (6th Cir. 2004) ("In evaluating whether summary judgment is proper, we do not weigh the evidence, but rather view the evidence in the light most favorable to [the non-moving party] to divine the existence of a genuine dispute of material fact.")

Third, the lead opinion's framework mistakenly places the ultimate burden of persuasion on the plaintiff. The lead opinion states that the final step in the burden-shifting analysis involves evaluating the plaintiff's showing by considering "the strength of the plaintiff's showing of discriminatory effect against the strength of the defendant's interest in taking the challenged action." Lead Op. at 10. Under the business-necessity test, however, the landlord will successfully defend against a showing of disparate effects only if he or she proves that the challenged action constitutes a business necessity. If the landlord fails to carry this burden of proof, then he or she should lose once the plaintiff has established a statistically significant showing of disparate effects regardless of its strength. Conversely, if the defendant does indeed prove business necessity, he or she should not be liable under a disparate-impact theory of the FHA no matter how strong the showing of disparate effects.

In conclusion, we are bound by the factors set forth in *Arthur* when evaluating FHA disparate-impact claims against *government* defendants. But the framework outlined in *Arthur* is not well suited to the evaluation of FHA disparate-impact claims against *private* defendants. The burden-shifting framework for FHA disparate-impact claims against private defendants is straightforward: first, the plaintiff establishes a prima facie case by showing that a challenged housing practice or policy has caused a statistically significant disparate effect on a protected group; second, the housing owner can assert the affirmative defense that the challenged action constitutes a business necessity and that there are no less discriminatory alternatives.

## C. Withdrawal from the Section 8 Program and Disparate Impact

I concur in the lead opinion's holding that a landlord's withdrawal from the Section 8 program, when it has a disparate impact on members of a protected class, may violate the FHA. Courts should give the "broad and inclusive" language of the FHA a "generous construction" to effectuate its remedial purpose. *Trafficante v. Metro. Life Ins. Co.* 409 U.S. 205, 209, 212 (1972).

No compelling jurisprudential or policy reasons exist to make a categorical exception to our recognition of disparate-impact claims under the FHA for the withdrawal by landlords from the Section 8 program. Graoch argues that the voluntary nature of the Section 8 program should counsel against allowing a plaintiff to bring a disparate-impact claim based on a landlord's decision to withdraw. Appellee Br. at 11-14. Graoch derives this analysis from the Seventh Circuit opinion in *Knapp v. Eagle Property Management Corp.*, 54 F.3d 1272 (7th Cir. 1995), which held that the refusal by a landlord who participated in the Section 8 program to accept a new Section 8 tenant could not give rise to liability under a disparate-impact analysis of the FHA. *Id.* at 1280. The Seventh Circuit found no principled basis upon which to distinguish between a landlord's decision not to participate in the Section 8 program and the decision of a participating housing owner not to accept a new Section 8 tenant. *Id.* Accordingly, the Seventh Circuit held that because nonparticipation is not actionable, neither can a landlord's withdrawal from the program give rise to a disparate-impact claim. *Id.* ("The actions of both non-participating and participating owners have the same impact on minorities and to hold only the latter liable for racial discrimination for that conduct would deter them from joining or remaining involved in the program.")

The voluntary nature of the Section 8 program does caution us to consider carefully whether a landlord's decision to withdraw from the program may give rise to liability under the FHA. Congress's revision of the FHA has only reinforced that body's intent to make Section 8 a voluntary program. Before 1996, some courts interpreted 42 U.S.C. § 1437f(d)(1)(B), which provided "that the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause" to prescribe an "endless lease." Some courts read this provision to mean that the owner could not refuse to renew a lease at the conclusion of the lease period, except for the specified reasons. *30 Eastchester LLC v. Healy,* Index SP-2002-77, 2002 WL 553709, at *3 (N.Y. City Ct. 2002) (unpublished opinion) (citing *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 300 n.5 (2d Cir. 1998); *Tann Realty Co. v. Thompson*, 112 Misc.2d 392, 446 N.Y.S.2d 959 (Civ. Ct., Kings Co. 1981)). In 1996, however, Congress amended this section of the FHA as part of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 203, 110 Stat. 1321, at *1321-281 (1996), by inserting "during the term of the lease" into both clause (ii) and clause (iii) of the section. "The effect of the statutory change was to eliminate the 'endless lease' interpretation of such provision and clarify that a landlord could terminate a Section 8 tenant's lease and, *a fortiori*, its participation in the Section 8 program with respect to that tenant, when the term of the tenant's lease expires." *30 Eastchester*, 2002 WL 553709, at *4.

The same Omnibus Budget Act also repealed the "take one, take all" provision of the United States Housing Act of 1937. Omnibus Consolidated Rescissions and Appropriations Act § 203. That provision, previously codified at 42 U.S.C. § 1437f(t)(1)(A) was entitled "Nondiscrimination Against Certificate Holders and Voucher Holders" and provided that no owner who had entered into a contract for housing assistance payments under the section "shall refuse to lease any available dwelling unit in any multifamily housing project of such owner to a holder of a voucher." *Glover v. Crestwood Lake Section 1 Holding Corps.*, 746 F. Supp. 301, 308 (S.D.N.Y. 1990).

Ultimately, however, I disagree with the Seventh Circuit's reasoning that the voluntary character of the Section 8 program precludes liability for withdrawal from the program under a disparate-impact theory of the FHA. The repeal of the "endless lease" and "take one, take all" provisions of 42 U.S.C. § 1437f evinced Congress' intention that a landlord's decision to participate in the Section 8 program should not require him or her to accept any particular Section 8 tenant or to renew endlessly the lease of a given tenant. The statutory repeals, however, did not address the issue of a complete withdrawal from the program and a decision not to accept any new Section 8 tenants. The FHA imposes a non-discrimination mandate on actors engaging in many different types of voluntary actions. *See, e.g.*, *Betsey*, 736 F.2d at 986-87 (allowing a disparate-impact claim to

proceed where a private landlord issued eviction notices to families with children in an effort to institute an all-adult rental policy). Landlords who choose not to accept any Section 8 vouchers may do so for all kinds of legitimate or biased reasons that remain behind the veil of nonparticipation, far removed from legal scrutiny. Once a landlord decides to enroll in the Section 8 program, however, he or she necessarily accepts a new set of responsibilities toward tenants under the FHA. These include duties both to refrain from intentional discrimination on the basis of a protected characteristic and, in the case of a business practice that has a disparate impact on a protected class, to implement when possible an alternative business practice with less discriminatory effects. *See Alexander*, 177 F.3d at 405-06. I agree with the lead opinion that the Sixth Circuit should decline to follow the Seventh Circuit and should instead allow plaintiffs to use evidence of disparate impact to show that a landlord violated the FHA by withdrawing from the Section 8 program.

In addition to *Knapp*, Graoch relies on the Second Circuit's decision in *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir. 1998), to argue against the propriety of allowing a disparate-impact claim for withdrawal from the Section 8 program. Appellee Br. at 11-12. In *Salute*, however, the majority based its opinion on the fact that the defendant landlord had never accepted tenants who, at the time of application, participated in the Section 8 program. *Id.* at 302 ("[N]on-participation constitutes a legitimate reason for their refusal to accept section 8 tenants and . . . we therefore cannot hold them liable for . . . discrimination under the disparate impact theory.") (quoting *Knapp*, 54 F.3d at 1280) (alterations in the original). Therefore, *Salute* is not applicable in the instant case because of the distinction between nonparticipation, at issue in *Salute*, and withdrawal from the Section 8 program, at issue here.[7]

Graoch further suggests that allowing disparate-impact claims based on a landlord's withdrawal from the Section 8 program will deter landlords from entering the program. Appellee Br. at 13 ("If a landlord is held to a perpetual lease—and all of the administrative burdens which Section 8 compliance entails—once it accepts a Section 8 tenant, many landlords may never agree to enter into the program at all, thereby decreasing the available private housing stock for low income tenants.") (quoting *30 Eastchester LLC*, 2002 WL 553709, at *4). The *Eastchester* case upon which Graoch relies, however, did not involve a disparate-impact claim under the FHA. Instead, a tenant-plaintiff claimed that her landlord's allegedly illegal withdrawal from the Section 8 program, at the termination of her lease, constituted a defense to her own nonpayment of rent. *Id.* at *2. Allowing disparate-impact claims for withdrawal does not yoke landlords to a "perpetual lease." A plaintiff's showing that a withdrawal from the Section 8 program has a disparate effect on a protected class merely establishes a plaintiff's prima facie case and does not automatically result in liability. Such claims require only that a landlord show business necessity. *See Green v. Sunpointe Assocs., Ltd.*, No. C96-1542C, 1997 WL 1526484, at *4 (W.D. Wash. 1997).

Graoch argues that a landlord would incur significant expense defending itself against a disparate-impact claim at the summary-judgment stage. Appellee Br. at 16. But the Supreme Court has not shied away from allowing innovative disparate-impact claims even though newly-recognized causes of action may potentially impose costs on businesses. *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. 228, 232 (2005) (holding that a disparate-impact theory is cognizable under the Age Discrimination in Employment Act). Landlords have a considerable financial incentive to accept Section 8 tenants because the federal government's subsidy of a portion of the market-based rent expands the pool of available tenants. Clark, 6 J. AFFORD. HOUS. & CMTY. DEV. L. at 187. This

---

[7]In his dissent to the majority opinion in *Salute*, Judge Calabresi argued that the defendant landlord's acceptance of Section 8 vouchers from pre-existing tenants, even though he refused new Section 8 tenants, made the landlord a partial participant in the program rather than a nonparticipant. 136 F.3d at 312 (Calabresi, J., dissenting). Nevertheless, the majority viewed the landlord as a nonparticipant and based the court's decision on the view that *nonparticipation* does not incur liability.

economic reality makes it less likely that the potential of disparate-impact claims upon withdrawal from Section 8 will deter landlords from entering the program.

## III.  MHRC'S DISPARATE-IMPACT CLAIM

### A.  Prima Facie Case

Because the district court ruled as a matter of law that a landlord's withdrawal from the Section 8 program cannot alone constitute a violation of the FHA, it did not discuss the statistical evidence that MHRC would need to produce to establish a prima facie case of disparate impact. Graoch appears to have admitted, however, "that the uncontested statistical evidence would in theory support a 'disparate impact' claim against Graoch if . . . Graoch's mere withdrawal from the voluntary Section 8 program could subject it to such a claim . . . and Graoch's business necessity defense were to be rejected by the Court . . . ." R. 28, Graoch's Response to MHRC's Cross-Motion for Summary Judgment, p. 2 n. 2. Because all members of this panel are in agreement that a landlord's withdrawal from the Section 8 program can give rise to a disparate-impact claim, Graoch's admission obligates this court to hold that MHRC has established a prima facie showing of disparate effects.[8] As a result of Graoch's concession in the district court, we need not engage in any further assessment of MHRC's statistical evidence. In the absence of disagreement and briefing on this issue, I think it is unwise to set forth any framework for evaluating the statistical evidence necessary to prove disparate effects.

### B.  Business Necessity

Because Graoch has conceded that its withdrawal from the Section 8 program would have a disparate effect on African-Americans, to avoid liability under a disparate-impact theory of the FHA Graoch needs to prove that the withdrawal amounted to a business necessity and that no less discriminatory alternatives were available. Graoch stated that it decided to withdraw from the Section 8 program because participation had required that Graoch agree to a Housing Assistance Payments Contract "which imposed terms and conditions more burdensome than those contained in Autumn Run's standard Lease." J.A. at 70 (Hamasaki Aff.) In addition, Graoch stated that the Housing Authority of Jefferson County held the company "to an impossible standard" in enforcing requirements for the quality of the housing provided. *Id.* Specifically, according to Graoch the Housing Authority abated rental payments "for conditions which Graoch was either not made aware of prior to inspection, or which it attempted to fix only to be cited upon re-inspection for not making its repairs to the arbitrary satisfaction of the inspector." *Id.* Neither party devoted attention on appeal to arguing whether a business necessity existed to justify Graoch's withdrawal from the Section 8 program. Insufficient evidence exists for us to rule as a matter of law regarding whether business necessity justified Graoch's withdrawal from the Section 8 program. Under these circumstances, we should remand to the district court for further development of the business necessity factor.

Upon remand, the district court should give the parties an opportunity to brief the issue of business necessity and to present relevant evidence. To survive any motion that Graoch might make for summary judgment, MHRC would need to create a genuine issue of material fact that Graoch's withdrawal from the Section 8 program did not constitute a business necessity. MHRC would be

---

[8] Graoch's concession that the statistical evidence would support a disparate-impact claim, if a withdrawal from the Section 8 program could give rise to liability under the FHA and if we rejected Graoch's business-necessity defense, implicitly concedes that the evidence establishes a prima facie showing of disparate effects. Accordingly, although we do not decide the issue of business necessity today, as I explain below, we must nevertheless assume that Graoch has conceded that its withdrawal from the Section 8 program had a disparate effect on African-Americans.

able to discharge this burden by showing "that there is an absence of evidence to support [Graoch's] case." *Wright v. Murray Guard, Inc*., 455 F.3d 702, 706 (6th Cir. 2006) (citing *Celotex Corp*., 477 U.S. at 322-23). Conversely, to survive a motion for summary judgment made by MHRC, Graoch would need to establish a genuine issue of material fact that the withdrawal constituted a business necessity.

## IV.  CONCLUSION

For the foregoing reasons, I concur in the lead opinion's conclusion that a landlord's withdrawal from the Section 8 program may give rise to liability under the disparate-impact theory of the FHA. I believe that the appropriate action for this court to take is to **REVERSE** the district court's grant of summary judgment to Graoch, **VACATE** the denial of summary judgment to MHRC, and **REMAND** the case for further proceedings.